Patrick M. Flatley
United States Bankruptcy Judge
**Dated: Wednesday, September 30, 2009 2:01:25 PM**

# UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

IN RE:                                            )
                                                  )
    BUFFALO COAL COMPANY, INC.,    )    Case No. 06-bk-00366
                                                  )
    Debtor.                        )    Chapter 7
_____           )
                                                  )
                                                  )
JOHN W. TEITZ, AS TRUSTEE OF THE                   )
ESTATE OF BUFFALO COAL                             )
COMPANY, INC.,                                     )
                                                  )
    Plaintiff,                     )
                                                  )
    v.                             )    Adv. Proc. No. 08-ap-00038
                                                  )
VIRGINIA ELECTRIC AND POWER                        )
COMPANY, d/b/a DOMINION                            )
VIRGINIA POWER,                                    )
                                                  )
    Defendant.                     )
_____           )

## MEMORANDUM OPINION

Dominion Virginia Power ("DVP") seeks summary judgment on an adversary complaint filed by John W. Teitz (the "Trustee"), as chapter 7 trustee for the estate of Buffalo Coal Company, Inc. (the "Debtor"), for breach of contract and indemnity arising from DVP's pre-petition termination of a coal supply agreement between DVP and the Debtor.

1

In the alternative, DVP requests entry of partial summary judgment declaring that the coal supply agreement provides the exclusive remedies for breach, and consequently, DVP cannot be held liable for other damages[1] the Debtor may have sustained as a result of DVP's alleged breach of the agreement.

For the reasons stated herein, the court will grant in part and deny in part DVP's motion for summary judgment.  The court will deny entry of summary judgment on the issue of whether DVP breached the coal supply agreement.  The court will grant summary judgment to DVP on the Trustee's claim for indemnity and the extent of damages available under the coal supply agreement's provision regarding the limitations of liability.

## I. STANDARD OF REVIEW

Summary judgment is appropriate when the matters presented to the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).  The party moving for summary judgment has the initial burden of proving that there is no genuine issue as to any material fact.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 161 (1970).  Once the moving party has met this initial burden of proof, the non-moving party must set forth specific facts sufficient to raise a genuine issue for trial and may not rest on its pleadings or mere assertions of disputed facts to defeat the motion.  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (stating that the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts").  The mere existence of a scintilla of evidence in support of the opposing party's position will not be sufficient to forestall summary judgment, but "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In ruling on a motion for summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  A fact is not

---

[1]For example, the Trustee contends that, as a result of DVP's alleged wrongful termination, the Debtor incurred substantial environmental liabilities.  The Trustee seeks to recover the costs of these liabilities based on the agreement's indemnity provision.

"genuinely disputed" unless the factual conflict between the parties requires a trial of the case for resolution. *Finley v. Giacobbe*, 79 F.3d 1285, 1291 (2d Cir. 1996) ("If there is any evidence in the record from which a jury could draw a reasonable inference in favor of the non-moving party on a material fact, this Court will find summary judgment is improper.").

## II. BACKGROUND

DVP operates the "Mount Storm Power Station" ("Mt. Storm") in Grant County, West Virginia. The Debtor's coal mining operation is in close proximity to Mt. Storm, and the Debtor supplied it with coal for the two decades before it filed bankruptcy. Throughout the Debtor's relationship with DVP, coal was supplied pursuant to direct contracts with DVP, or under subcontracts, including an agreement with PBS Coals, Inc. ("PBS") who purchased the Debtor's coal to fulfill its own supply obligations to DVP. The current dispute follows a renegotiation of a January 2002 coal supply contract directly between the Debtor and DVP (the "2002 Supply Agreement").

### A. The Debtor's Cash-Flow Problems

In the first quarter of 2004, the Debtor was not operating profitably under its coal supply agreements with DVP and PBS, and it notified DVP of its financial difficulties. By May 2005, the Debtor faced $7.2 million in accounts payable, 40% of which were over 90 days past due. The Debtor had also fallen short on its supply obligations to DVP and PBS.

On May 11, 2005, DVP executed a Letter Agreement that modified the terms of the 2002 Supply Agreement (the "First Letter Agreement"). The First Letter Agreement increased the price of coal per ton on a portion of the supply required in the 2002 Supply Agreement and provided for DVP to pay $1.5 million to the Debtor as an advanced payment on the price increase. In July 2005, DVP executed another Letter Agreement (the "Second Letter Agreement") that provided another short-term price increase. Despite execution of the Letter Agreements, DVP continued to demand performance from PBS, which, in turn, required the Debtor to continue to supply coal to Mt. Storm at a lower price than the prices provided in the Letter Agreements. Thus, the Letter Agreements notwithstanding, the Debtor's financial condition worsened.

### B. Renegotiation

3

Although from 2004 to 2005 the Debtor's short-run financial outlook was bleak, some developments made restructuring a viable option.  Beginning in 2003, the Debtor sought to obtain a new permit (the "C-1 North Permit") that would allow it to expand mining operations and production levels.  By August 2005, the Debtor expected the C-1 North Permit to be issued in November 2005.

The Debtor hired George Brikis to investigate its financial restructuring in conjunction with the anticipated issuance of the C-1 North Permit.  As a result of his investigation, Brikis recommended a target price that the Debtor should obtain per ton of coal.  Thus, in August 2005, the Debtor decided to approach DVP in negotiating a long-term modification of the 2002 Supply Agreement, along with the First and Second Letter Agreements.  With an increase in price on the DVP contract and an expansion in production at the C-1 North Permit area, the Debtor hoped to stave off collections from its creditors, secure new financing, and achieve positive cash flow.

The Debtor and DVP were able to reach an agreement on a new contract price per ton of coal close to what Brikis had recommended.  DVP demanded, however, that the Debtor's affiliates guarantee its performance and that any new agreement would be conditioned upon the Debtor acknowledging approximately $34 million in liabilities for its shortfalls under the 2002 Supply Agreement.

On October 20, 2005, DVP sent to the Debtor a Settlement Agreement, under which the Debtor agreed to acknowledge a $34 million debt under the 2002 Supply Agreement.  In turn, DVP agreed to withhold collection on the debt.  The forbearance agreement was conditioned upon the Debtor's adequate performance under a new supply agreement.  On October 25, 2005, DVP, the Debtor and the Debtor's guarantors executed the new coal supply agreement (the "2005 Supply Agreement) and the Settlement Agreement as proposed by DVP.

**C. Early Termination Provisions**

The 2005 Supply Agreement included termination provisions that were not included in the 2002 Supply Agreement.

Article 9 is titled, "Events of Default, Early Termination and Limitation of Liability." Under Article 9.1(d), an Event of Default occurs when the "Defaulting Party shall be subject to a Bankruptcy Proceeding."  "Bankruptcy Proceeding" is defined to mean:

4

a Party or entity (1) makes an assignment or any general arrangement for the benefit of creditors, (2) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under any bankruptcy or similar law for the protection of creditors, (3) has such a petition filed against it, (4) otherwise becomes bankrupt or insolvent (however evidenced), (5) has a liquidator, administrator, receiver, trustee, conservator or similar official appointed with respect to it or any substantial portion of its property or assets, or (6) is unable to pay its debts as they fall due.

(Doc. No. 197, App. 35, Article 1.1(c).)

Once an Event of Default occurs, the Non-Defaulting Party may "accelerate and liquidate the Parties' respective obligations by establishing, and notifying the Defaulting Party of an Early Termination Date . . . on which [the] Agreement shall terminate . . . and/or . . . withhold any payments due to the Defaulting Party until such Event of Default is cured." (Doc. No. 197, App. 35, Article 9.2(a).)

Acceleration and liquidation of the parties' obligations is accomplished through calculating a "Termination Payment." (Doc. No. 197, App. 35, Article 9.3.)  The Non-Defaulting Party must notify the Defaulting Party as to which Party owes the net Termination Payment. Within two business days of receiving an invoice containing the calculation of the Termination Payment, Article 9.2(c) requires either payment or a response explaining the Defaulting Party's dispute with the calculation of the Termination Payment.  (Doc. No. 197, App. 35, Article 9.2(c).)

The right to receive the termination payment "shall be without prejudice and in addition to any right of setoff, combination of accounts, lien or other right to which any Party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."  (Doc. No. 197, App. 35, Article 9.3(d).)  The 2005 Supply Agreement also contains the following "Limitation of Liability" statement:

THE PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS AGREEMENT SATISFY THE ESSENTIAL PURPOSES HEREOF.   FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS HEREIN PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXLUSIVE REMEDY, THE LIABLE PARTY'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR

5

DAMAGES AT LAW OR IN EQUITY ARE WAIVED UNLESS OTHERWISE PROVIDED IN THIS AGREEMENT.  IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY HEREIN PROVIDED, THE LIABLE PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY, SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED.   EXCEPT AS MAY BE PROVIDED FOR IN SECTION 9.6, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS, OR OTHER BUSINESS INTERRUPTION DAMAGES, WHETHER BY STATUTE, IN TORT OR IN CONTRACT, UNDER THIS AGREEMENT, ANY TRANSACTION, ANY INDEMNITY PROVISION OR OTHERWISE.

## C. Continued Cash-Flow Problems

After execution of the 2005 Supply Agreement, the Debtor still had cash flow problems and its principals reported to DVP that it would need an additional advance of $2.2 million. DVP denied the request, but agreed to accelerate payment terms to cash on delivery. Nevertheless, by February 2006, at least one of its secured creditors had disabled some of the Debtor's equipment based on the Debtor's non-payment.

The Trustee asserts that during a phone conference attended by DVP and the Debtor's principals in early February 2006, a DVP official, Karla Haislip, suggested that the Debtor should file for bankruptcy and "DVP could do some things to help."  (Doc. No. 197, App. 1 ¶ 63.)  The Debtor sent Mr. Brikis to DVP's offices to discuss the details of Ms. Haislip's suggestion.

At the meeting, DVP requested that Mr. Brikis send an email summarizing the meeting. On February 20, 2009, Mr. Brikis, with approval from the Debtor's President, Charles R. Howdershelt, sent an email to Ms. Haislip (the "Brikis Email"), which outlines "what Buffalo [] propos[ed] as a role for Dominion/Vepco in the company's Ch. 11 reorganization plan."  (Doc. No. 197, App. 43.)  The email describes various credit facilities to be provided by DVP and lists available collateral.  The email also states that DVP would need to increase the price it was paying for the Debtor's Coal.  The email concludes that the Debtor is considering reorganizing in chapter 11:

6

Time is of the essence.  Buffalo must identify a DIP provider within the next few weeks due to inadequate liquidity.

The company will be approaching a few other potential "strategic" providers (likely to be competitors).  While the company's preference is to work with Dominion/Vepco, they do not have the luxury of waiting very long for an answer.  If you have an interest in this concept/DIP role (I think by doing so you will gain some input/control over the ultimate outcome), please advise Buffalo in writing by February 28.  A commitment would have to be in place shortly thereafter.

(Doc. No. 197, App. 43.)

## D. Contract Termination

Two days after receiving the Brikis Email, on February 22, 2006, Ms. Haislip faxed to the Debtor a letter terminating the 2005 Supply Agreement (the "Termination Letter") based on the Debtor's insolvency.  The letter asserted that an Event of Default had occurred, provided notice that DVP intended to accelerate the liquidated damages as provided under Article 9.2(a), and terminated DVP's forbearance obligation under the Settlement Agreement.  On February 24, 2006, the Debtor ceased its coal mining operations.

On March 3, 2006, Jeffrey G. Miscikowski, a DVP officer, faxed to the Debtor a letter with an invoice setting a liquidated Termination Payment at $56,370,521 and demanding payment within two days.  Mr. Miscikowski's letter also demanded payment of the $32,038,095 indebtedness under the Settlement Agreement, which DVP asserts became due on the Debtor's default of the 2005 Supply Agreement.

On March 7, 2006, an attorney for the Debtor responded to DVP's termination notice and liquidated damages demand.  The letter disputes DVP's Termination Payment calculation and whether an event of default had occurred as of February 23, 2006.  The letter also asserts that DVP's withholding of payment constituted an event of default, and provided DVP with three days to cure the default.

On March 9, 2006, DVP filed a complaint in the United States District Court for the Eastern District of Virginia against the Debtor and its guarantors.  The complaint sought breach of contract damages and payment on guarantees of $88,408,616 under the 2005 Supply Agreement and the Settlement Agreement.

## E. Litigation in Bankruptcy Court

7

On May 5, 2006, the Debtor filed a bankruptcy petition under Chapter 11, staying DVP's complaint.  In turn, DVP filed its proof of claim in the bankruptcy case for $88,408,616 in contractual damages.  On June 13, 2007, the Debtor's bankruptcy case was converted to Chapter 7.

On May 1, 2008, the Trustee filed this complaint against DVP objecting to its proofs of claim and asserting three grounds for damages.   Count I alleges that DVP breached the 2005 Supply Agreement when it repudiated the agreement by letter on February 22, 2006 without a prior written demand for performance.  Count II asserts that DVP is obligated to indemnify the Debtor against the environmental reclamation liabilities to state agencies and all other claims the Debtor became subject to as a result of DVP's termination.  Count III asserts that termination of the 2005 Supply Agreement constitutes a breach of the Settlement Agreement.

### III. DISCUSSION[2]

On summary judgment, DVP seeks a declaration that it validly terminated the 2005 Supply Agreement, and, thus, could not have breached the contract.  In the alternative, should the court refuse to grant summary judgment in its favor on that basis, DVP seeks to narrow the issues at trial by obtaining a declaration that the 2005 Supply Agreement excludes consequential damages, and the Agreement's indemnification provision does not encompass any consequential damages, and, even if it did, any demand under that provision is time-barred.

### A.  DVP's Termination of the 2005 Supply Agreement

DVP asserts, among other things, that its termination of the 2005 Supply Agreement was authorized by the terms of the contract on the grounds that the Debtor was insolvent, which is listed as an "Event of Default."

#### i. Meaning of "Bankruptcy Proceeding" as an "Event of Default"

In DVP's view, the Debtor triggered an Event of Default in that the Debtor was insolvent at the time DVP terminated the 2005 Supply Agreement, and, thus, DVP could not have been in breach when it acted in compliance with the contract's termination provisions.

_____

[2] In an earlier proceeding in the Debtor's bankruptcy case, the court found that Virginia law governs the 2005 Supply Agreement.  *In re Buffalo Coal Company, Inc.*, No. 06-bk-366, (Doc. No. 72.).  Thus, the court will apply Virginia law to the contract dispute in this proceeding.

8

The Trustee asserts that the 2005 Supply Agreement's termination provision is patently ambiguous in that more than one meaning of the termination provision is permissible. The termination provision states:

> 9.1 Events of Default
> An Event of Default ("Event of Default") with respect to a Party (the "Defaulting Party") shall mean any of the following:
> . . . .
> > (d) the Defaulting Party shall be subject to a Bankruptcy Proceeding . . . .

(Doc. No. 197, App. 35, Article 9.1.)  The term, "Bankruptcy Proceeding," is defined under Article 1.1(c) as follows:

> Bankruptcy Proceeding – Shall mean with respect to a Party or entity, such Party or entity (1) makes an assignment or any general arrangement for the benefit of creditors, (2) filed a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under any bankruptcy or similar law for the protection of creditors, (3) has such a petition filed against it, (4) otherwise becomes bankrupt or insolvent (however evidenced), (5) has a liquidator, administrator, receiver, trustee, conservator or similar official appointed with respect to it or any substantial portion of its property or assets, or (6) is unable to pay its debts as they fall due.

(Doc. No. 197, App. 35, Article 1.1(c).)

In considering disputed contractual language, the court must "determine the parties' intention, which should be ascertained, whenever possible, from the language the parties employed in the contract." *Va. Elec. & Power Co. v. Norfolk S. Ry. Co.*, 2009 Va. LEXIS 83, at *20, ___ S.E. 2d ___ (Va. 2009).  "Whether contractual provisions are ambiguous is a question of law and not of fact. . . ." *Nextel WIP Lease Corporation v. Saunders*, 666 S.E.2d 317, 320 (Va. 2008).

"A contractual term, absent a definition in the contract, is construed according to its usual, ordinary, and popular meaning." *Palmer & Palmer Co., L.L.C. v. Waterfront Marine Costr., Inc.*, 662 S.E.2d 77, 81 (Va. 2008).

An ambiguity exists when either "the contract's language is of doubtful import, is susceptible of being understood in more than one way or of having more than one meaning, or refers to two or more things at the same time." *Va. Elec. & Power Co. v. Norfolk S. Ry. Co.*, at *23.  Even if multiple possible meanings are not conflicting, "the language of a contract is not

9

clear and unambiguous, and resort to extrinsic evidence is necessary, if the situation is such that fair-minded men might reasonably draw different conclusions" as to the meaning of the contract. *Geoghegan Sons & Co., Inc. v. Arbuckle Brothers*, 123 S.E. 387, 389 (Va. 1924).

A "patent" ambiguity arises where "the language of the contract itself reveals that it can be interpreted in more than one way. . . . ," whereas a latent ambiguity arises "where language while appearing perfectly clear at the time the contract [is] formed, because of subsequently discovered or developed facts, may reasonably be interpreted in either of two ways." *Va. Elec. & Power Co.* at *23-*24 (internal quotations omitted).

Once it is determined that a contractual provision is unambiguous, it is the duty of the court, then, to construe the contract terms according to their plain meaning without resort to extrinsic evidence. *Bentley Funding Group, L.L.C. v. SK& R Group, L.L.C.*, 609 S.E.2d 49 (Va. 2005). "The guiding light in construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Palmer & Palmer Co.,* 662 S.E.2d at 80.

In the Trustee's view, Article 9.1(d) could mean, on one hand, that a bankruptcy petition under title 11 is necessary to trigger an Event of Default, and, on the other hand, that something less than a bankruptcy petition is sufficient.

The court rejects the Trustee's argument that 9.1(d) could mean that only a bankruptcy petition is a "Bankruptcy Proceeding" as that term is defined in Article 1.1(c). "Bankruptcy Proceeding" is a defined term. The language of Article 9.1(d) uses the term Bankruptcy Proceeding to stand in proxy for a list of six alternatives – only one of which is the filing of a bankruptcy petition. To allow Article 9.1(d) to mean that a bankruptcy petition is necessary for an Event of Default would require the reader to ignore alternatives (1), and (3) through (6), in construing the definition of Bankruptcy Proceeding. The Trustee's argument to the contrary is at odds with the plain language of the contract.

Instead, the conditions for triggering an Event of Default under Article 9.1(d) are clear and unambiguous according to the contractual definition of "Bankruptcy Proceeding" under Article 1.1(c).

**ii. The Debtor's "Insolvency"**

Even conceding that the Event of Default for "Bankruptcy Proceeding" includes more

10

than the filing of a bankruptcy petition, the Trustee asserts that DVP did not have sufficient evidence of such an Event of Default upon which to base its termination of the 2005 Supply Agreement.

Article 1.1(c)(4) provides as a definition for Bankruptcy Proceeding, "such Party or entity . . . (4) otherwise becomes bankrupt or insolvent (however evidenced)." "Insolvent" means: ". . . having liabilities that exceed the value of assets; having stopped paying debts in the ordinary course of business or being unable to pay them as they fall due." *Black's Law Dictionary* 812 (8th ed. 2004). Subsection 1.1(c)(6) reinforces the fact that a Party's inability to pay its debts as they fall due is a Bankruptcy Proceeding for purposes of an Event of Default under Article 9.1(d).

To prove the Debtor's insolvency, DVP relies upon the following statement made by the Trustee during discovery:

> It is also the Trustee's understanding that, in light of the terms of the 2005 Settlement Agreement, the Debtor's assets were less than its liabilities in October 2005 and in February 2006. It is also the Trustee's understanding that in October 2005 and in February 2006, the Debtor was unable to pay debts when due, but that it was a going concern and its creditors were willing to work with it regarding the terms and timing of payment of its debts.

(Doc. No. 139, Ex. 6 at 6.)

DVP also relies upon the following testimony by the Debtor's Vice President, Gerald Ramsburg:

> Q: And do you agree that the contract with Dominion permitted Dominion to terminate that contract if you were either insolvent or couldn't pay your debts as they fell due?
> A: (MR. RAMSBURG) That's the broad terminology that was inserted into the last contract, yes, sir.
> Q: And in the termination letter that Dominion delivered on February 22, Dominion stated that one of the grounds for termination was that you were insolvent and you were not paying your debts – were not able to pay your debts as they came due, correct.
> A: (MR. RAMSBURG) Yes, sir. But they – we were in the same shape on February 22nd as we were when [KPMG] did all their studies of us. So, you know, prior to signing the contract.
> Q: That's not the question. The question is on February 22 you were not able to pay your debts as they fell due, correct?

11

A: (MR. RAMSBURG) I've said in '05 we weren't paying our debts as they fell due.

Q: And on February 22nd, 2006, also, correct?

A: (MR. RAMSBURG) Yes.

(Doc. No. 139, Ex. 4, Part 2 at 13.)

DVP asserts that the sworn statements confirm that the Debtor had become insolvent, thus, triggering an Event of Default under Article 9.7(d) as defined under subsections 1.1(c)(4) and (6).

The Trustee, however, asserts that his answer to DVP's discovery request does not "conclusively establish that Ms. Haislip's February 22, 2006 termination letter is justified." Instead, the Trustee, points to the following additional language included in his response:

It is also the Trustee's understanding that in October 2005 and in February 2006, the Debtor was unable to pay debts when due, but that it was a going concern and its creditors were willing to work with it regarding the terms and timing of payment of its debts.

The Trustee's statement and Ramsburg's testimony establish that the Debtor had liabilities greater than its assets and that the Debtor was unable to pay its debts as they became due, which satisfies the "insolvency" Event of Default in the 2005 Supply Agreement. The willingness of the Debtor's creditors to workout payment plans for the Debtor is immaterial to determining the Debtor's solvency.

**B. Trustee's Theories Excusing Conditions for Early Termination**

Even if DVP had grounds to terminate the 2005 Supply Agreement, the Trustee argues that DVP waived that right and/or is estopped from terminating the Agreement.

**i. Waiver**

The Trustee argues that even if the contract allows termination upon a party's insolvency, DVP waived its right to Early Termination under Article 9.2.

Under Virginia law, waiver excuses the enforcement of an otherwise valid contractual right. "'Waiver is the voluntary, intentional abandonment of a known legal right, advantage, or privilege.'" *Weidman v. Babcock*, 400 S.E.2d 164, 167 (Va. 1991) (quoting *Fox v. Deese*, 362 S.E.2d 699, 707 (Va. 1987)). The elements of waiver are: "knowledge of the facts basic to the exercise of the right and the intent to relinquish that right." *Id.* "[W]aiver must be express, or, if

12

it is to be implied, [the intention to waive a right] must be established by clear and convincing evidence." *Baumann v. Capozio*, 611 S.E.2d 597, 600 (Va. 2005) (internal quotes omitted). "The essence of waiver is voluntary choice." *May v. Martin*, 137 S.E.2d 860, 865 (Va. 1964)).

In asserting waiver, the Trustee incorporates a list of factual statements along with the conclusion that DVP "manifested an intent to waive the 'insolvency' provision." From the Trustee's list of facts, the court can decipher no direct support for the assertion that DVP manifested an express intent to relinquish its right to terminate. The Trustee invites the court, however, to imply DVP's intent from the following facts: 1) DVP had knowledge of the Debtor's financial condition before executing the 2005 Supply Agreement; 2) DVP accepted performance with knowledge of the Debtor's insolvency; 3) DVP negotiated with the Debtor's other creditors to allow the Debtor time to perform under the new contract; 4) DVP altered the payment terms of the 2005 Supply Agreement to benefit the Debtor; and 5) DVP lobbied for the approval of the Debtor's C-1 North Permit.

In short, under the Trustee's argument, DVP knew that it had the right to terminate the 2005 Supply Agreement for insolvency at the moment the contract was executed. The Trustee then argues that DVP waived its right by continuing to accept performance under the contract and by making accommodations to the Debtor so that the Debtor would believe that its ongoing insolvency would not trigger an Event of Default.

In contrast, DVP asserts that in granting accommodations to the Debtor, DVP only wanted the parties to receive the benefit of the bargain under the 2005 Supply Agreement. DVP asserts that none of the Trustee's facts can show that DVP intended to relinquish its contractual rights to terminate the contract.

The court cannot determine, absent weighing the evidence at trial, whether DVP knowingly relinquished its right to terminate by making accommodations to the Debtor after it was aware of the Event of Default. If DVP waived its termination rights, then the Debtor would be excused from liability based upon a breach triggered by an Event of Default under the contract, and DVP would be barred from asserting the Debtor's insolvency as a defense to the Trustee's complaint for breach of contract. DVP's intent to relinquish a known right is a key element of waiver, and, thus, a material fact in determining whether DVP properly terminated

13

the contract. Therefore, summary judgment must be denied as to the Trustee's claim for breach of contract.

### ii. Equitable Estoppel

The Trustee also asserts that DVP should be equitably estopped from relying on the Debtor's insolvency as an Event of Default on the grounds that DVP assisted the Debtor in its attempt to restructure financially. [3]

For DVP to be equitably estopped from relying upon the Early Termination provisions to defend against the Trustee's complaint for breach of contract, the Trustee will need to show the following elements of equitable estoppel "by clear, precise, and unequivocal evidence:"

> (1) A material fact was falsely represented or concealed; (2) The representation or concealment was made with knowledge of the facts; (3) The party to whom the representation was made was ignorant of the truth of the matter; (4) The representation was made with the intention that the other party should act upon it; (5) The other party was induced to act upon it; and (6) The party claiming estoppel was misled to his injury.

*Moorman v. Blackstock, Inc.*, 661 S.E.2d 404, 411 (Va. 2008).

The Trustee argues that DVP is estopped from relying on the Debtor's inability to pay debts and its general insolvency as an Event of Default. The Trustee presents the court with affidavits and deposition testimony to suggest that DVP exhorted the Debtor to continue to invest capital and continue with mining operations even though DVP knew that the Debtor was unable to pay its debts since the first moment the 2005 Supply Agreement was executed. For example, the Trustee argues that under the circumstances, DVP's conduct constitutes false

---

[3] DVP assert's that equitable estoppel is inapplicable on the grounds that Virginia law does not recognize a cause of action for equitable estoppel, and, further, that the Trustee failed to plead estoppel properly. Here, however, the Trustee has not asserted estoppel as a "cause of action," but rather, the Trustee included equitable estoppel as an affirmative defense to DVP's counterclaims for breach of contract. "A party cannot be called on to show his estoppel until his adversary has attempted to use the improper defense." 7A *Michie's Jurisprudence of Va. & W. Va., Estoppel* § 38 (citing *Davis v. Thomas*, 32 Va. (5 Leigh) 1 (1834)). Until DVP asserted its grounds for Early Termination as an affirmative defense in its answer to the Trustee's cause of action for breach of contract, the Trustee could not raise his estoppel arguments. No responsive pleading to DVP's affirmative defense was required. Thus, the Trustee's equitable estoppel arguments are properly raised on summary judgment.

14

representations that the Debtor relied upon in changing its position. DVP, on the other hand, presents deposition testimony from the Debtor's Vice President, Gerald Ramsburg, that he knew of no false statements made by DVP.

It is reasonable to infer from the Trustee's evidence on summary judgment that DVP's course of conduct, not only its affirmative statements, mislead the Debtor. Drawing all reasonable inferences in favor of the non-movant, the court finds that a genuine issue of material fact exists regarding whether DVP is equitably estopped from asserting the Debtor's general insolvency or inability to pay debts as an Event of Default.

**C. Article 9.7 – "Limitation of Liability"**

DVP argues that Article 9.7 of the 2005 Supply Agreement precludes the damages sought in the Trustee's complaint, and argues that Article 9.7 provides the parties' exclusive remedies.

Article 9 is titled: "Events of Default, Early Termination and Limitation of Liability." Article 9.2 gives the Parties the right to terminate the contract early upon an Event of Default. Article 9.3 provides a remedy to the Parties for early termination in the form of a Termination Payment, which can result in a net amount owed to either the "non-defaulting" party or the party who triggered the Event of Default. While the Termination Payment is a remedy for an Event of Default, subsection 9.3(d) provides, in part, as follows:

> The remedy provided for in this Article shall be without prejudice and in addition to any right of setoff, combination of accounts, lien or other right to which any Party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

Article 9.7 is a five-sentence paragraph describing "Limitation of Liability." According to the second sentence in Article 9.7, if the agreement contains an "express remedy" for breach, then the express remedy is the "SOLE AND EXCLUSIVE" remedy. The fourth sentence of Article 9.7 provides:

> . . . NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS, OR OTHER BUSINESS INTERRUPTION DAMAGES, WHETHER BY STATUTE, IN TORT OR IN CONTRACT, UNDER THIS AGREEMENT, ANY TRANSACTION, ANY INDEMNITY PROVISION OR OTHERWISE.

The Trustee's complaint asserts that DVP's early termination constituted a breach of

15

contract.  Wrongful early termination is an "Event of Default" under Article 9.1(c) (". . . failure . . . to comply with any material obligation under this Agreement. . . .").  Because Article 9.3 provides an express remedy for any Event of Default listed in Article 9.1, the remedy set forth in Article 9.3 is the sole and exclusive remedy according to the second sentence of Article 9.7. Moreover, because the savings clause in Article 9.3 allows the parties to seek, in addition to the Termination Payment, "any . . . other right to which any Party is at any time otherwise entitled . . . .," the set of available remedies turns out to be very broad even under the limitation set forth in the second sentence of Article 9.7.

Nevertheless, regardless of how broadly the parties' available remedies are described in Articles 9.3, the fourth sentence of Article 9.7 specifically excludes "consequential, incidental, punitive, exemplary or indirect damages, lost profits, or other business interruption damages," even if such damages are provided elsewhere in the written agreement.

Therefore, according to the fourth sentence of Article 9.7, the Trustee's breach of contract damages against DVP cannot include "consequential, incidental, punitive, exemplary or indirect damages, lost profits, or other business interruption damages."

### i. Limitation of Liability Provisions are Unambiguous

The Trustee argues that the limitation of liability provisions of Article 9 are ambiguous. In particular, the Trustee finds that Article 9.3(d) and 9.7 are in conflict.  In the Trustee's view, the preservation of "any right" under Article 9.3(d) in addition to a Termination Payment contradicts the third and fourth sentences of Article 9.7, which limit recovery to "direct actual damages."

The court disagrees.  Article 9 does not have two different meanings by virtue of the fact that it preserves all remedies on the one hand, under Article 9.3(d), but limits liability on those remedies, on the other hand, under Article 9.7.  The court finds that the limitation of liability provisions are clear and unambiguous.

### ii. Damages for Breach of Contract Under Virginia Law

Article 9.7 utilizes the terms "direct" and "consequential" in describing damages. Because the 2005 Supply Agreement is a contract for the sale of goods, Virginia's Uniform Commercial Code governs the contract.   Under Virginia's commercial law, direct and consequential are terms of art, and, thus, the court must interpret the 2005 Supply Agreement

16

according to their specialized meaning under Virginia law.  The Supreme Court of Virginia uses the following common law definitions for direct and consequential damages:

> There are two broad categories of damages *ex contractu*: direct (or general) damages and consequential (or special) damages.  Direct damages are those which arise "naturally" or "ordinarily" from a breach of contract; they are damages which, in the ordinary course of human experience, can be expected to result from a breach. Consequential damages are those which arise from the intervention of "special circumstances" not ordinarily predictable. If damages are determined to be direct, they are compensable. If damages are determined to be consequential, they are compensable only if it is determined that the special circumstances were within the "contemplation" of both contracting parties.

*Blue Stone Land Co. v. Neff*, 526 S.E.2d 517, 518-519 (Va. 2000); *see also* Va. Code Ann. § 8.1A-305(b) (". . . neither consequential or special damages . . . may be had except as specifically provided in the Uniform Commercial Code or by other rule of law.").  Put another way, direct damages must "flow directly and immediately . . from the . . . breach." *Pulte Home Corp. v. Parex, Inc.*, 579 S.E.2d 188, 193 (Va. 2003).  If "a detour is required to get from [a] breach . . . to . . . damages, those damages cannot be considered as direct but consequential." *Id.* "Whether damages are direct or consequential is a question of law." *Neff*, 526 S.E.2d at 519.

Here, the Trustee asserts that DVP's breach of contract caused the following damages: loss of profit, incidental damages, environmental reclamation obligations to state agencies, and liability for breach of contract with third-parties.  Incidental damages and loss of profit are expressly excluded under Article 9.7, thus it is only necessary to determine whether reclamation obligations and third-party breach liabilities are excluded by Article 9.7.

Environmental reclamation damages do not, in the ordinary course of human experience, follow directly and immediately from the breach of a contract for the sale of goods.  While the parties may have understood that the Debtor's entire business, as well as its ability to keep up with operating costs such as environmental obligations, depended almost exclusively on its ability to sell coal to the Mt. Storm plant, such an understanding is a "special circumstance" that is not ordinarily predictable in the sale of goods.  Further, the environmental liabilities facing the Debtor are several consequences removed from DVP's termination.  The Debtor defaulted on its environmental obligations not because of DVP's termination, but, rather, on account of its own business failure.  The Debtor's business failure may have been in part due to DVP's termination,

but even business failure is generally considered a consequential damage from a breach of contract. *See, e.g., Conneaut Metalcasters v. Emco Wheaton, Inc. (In re Conneaut Metalcasters)*, Nos. 96-3417 & 96-3460, 1997 U.S. App. LEXIS 23780 (6th Cir. Sept. 5, 1997) ("The destruction of a seller's business does not arise naturally, in the usual course of things, upon a breach of a contract to purchase goods by a buyer.").

Thus, the Trustee's claim for environmental reclamation damages is a claim for consequential damages, which are excluded by the plain language of Article 9.7.

### iii. Limitation of Damages Available Under Va. Code Ann. § 8.2-708

The Trustee asserts that because DVP's wrongful termination repudiated the contract, DVP is subject to the damages set forth under Va. Code Ann. § 8.2-708, which provides that a seller of goods may recover either the difference between market and the contract price plus incidental damages, or lost profits plus incidental damages. The Trustee's argument, however, ignores Va. Code Ann. § 8.2-719(1)(a), which provides that "the agreement . . . may limit or alter the measure of damages recoverable under this title . . . ." Here, the contract clearly and unambiguously excludes consequential damages and incidental damages. Pursuant to Va. Code Ann. § 8.2-719(1)(a), the Debtor limited the measure of damages it could seek under § 8.2-708 by agreeing to Article 9 of the 2005 Supply Agreement.

### iv. Unconscionable Limitation of Consequential Damages

The Trustee argues that a material issue of fact exists as to whether the exclusion of consequential damages under Article 9.7 is unconscionable. Under Va. Code Ann. § 8.2-719(3),

> [c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

"The essence of unconscionability in this context is 'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" *Belvins v. New Holland North America, Inc.*, 97 F. Supp. 2d 747, 749 (W.D. Va. 2000) (interpreting Va. Code Ann. § 8.2-719(3)) (quoting *Carlson v. General Motors Corp.*, 883 F.2d 287, 294 (4th Cir. 1989). One-sided contracts are substantively unconscionable, while "disparity of choice and bargaining power" show procedural unconscionability. *Myrtle Beach*

18

*Pipeline Corp. et al. v. Emerson Elec. Co.*, 843 F. Supp. 1027, 1046 n.10 (D.S.C. 1993).

In determining whether a party had a meaningful choice the Fourth Circuit applies the following factors: "(1) the nature of the injuries suffered by the plaintiff; (2) whether the plaintiff is a substantial business concern; (3) disparity in the parties' bargaining power; (4) the parties' relative sophistication; (5) whether there is an element of surprise in the exclusion; and (6) the conspicuousness of the clause." *Myrtle Beach Pipeline*, 843 F. Supp. at 1046 (quoting *Kaplan v. RCA Corp.*, 783 F.2d 463, 467 (4th Cir. 1986)) (internal quotation marks omitted); *see also*, *Carlson*, 883 F.2d at 293.

First, it is undisputed that the Trustee's asserted damages are commercial in nature, rather than for personal injuries. Where the contract results in an exclusion of mere commercial losses, "the cause for sustaining the exclusion of consequential damages is far greater." *Myrtle Beach Pipeline.*, 843 F. Supp. at 1046.

Second, at the time of signing the contract, the Debtor was a substantial business concern that had dealt on equal footing with DVP in negotiating coal supply agreements for many years, and, thus, could "amply police its own bargains." *See id.* (". . .[U]nconscionability rarely exists unless the buyer is a consumer.").

Third, there existed no disparity in bargaining power. The Trustee highlights the fact that the Debtor had no choice but to agree to DVP's terms on a take-it-or-leave-it basis or face current liabilities that would force the Debtor out of business. At the same time, however, it is undisputed that the Debtor was DVP's major supplier of coal to Mt. Storm, and DVP faced the ripe possibility that its executory contract with the Debtor could be terminated in bankruptcy if the Debtor's current liabilities were not restructured. The bargain was precarious for both parties. Thus, despite the Debtor's financial condition as of October 25, 2008, the Trustee has failed to show that the two parties were in disparate bargaining positions at the time the damages exclusion was agreed upon.

Fourth, it is undisputed that the parties were sophisticated and employed lawyers to counsel them regarding the terms of the 2005 Supply Agreement.

Fifth, there was no element of surprise regarding the inclusion of Article 9. It is undisputed that the Debtor's principals had several days to read the agreement and the assistance of legal counsel in interpreting the language of the agreement before they signed. (Doc. No. 139,

Ex. 4 at 14.)

Finally, the damages exclusion provision is conspicuous. Article 9.7 is devoted entirely to defining, in capitalized font no less, the details of liability limitations. The 2002 Supply Agreement contained no similar Article, thus, the new addition would have been an obvious change from the old contract terms.

The Trustee has also failed to present evidence to support his conclusion that the consequential damages exclusion is substantively unfair. The Trustee has not disputed that the exclusion applies equally to DVP and to the Debtor. Thus, DVP has no advantage over the Debtor in the exclusion of consequential damages.

While unconscionability requires a fact-intensive review of the circumstances surrounding the bargain, the Trustee has not disputed any fact that is material to the question of whether the consequential damages exclusion in this case is unconscionable. Therefore, on summary judgment, the court finds that the clear and unambiguous exclusion of consequential damages contained in Article 9.7 precludes the Trustee from recovering from DVP the Debtor's third-party breach liabilities and environmental reclamation liabilities.

### v. Failure of Essential Purpose under Va. Code Ann. § 8.2-719(2)

As an alternative to unconscionability, the Trustee asserts that the consequential damages exclusion is abrogated by Va. Code Ann. § 8.2-719(2), in which it is provided that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act."

However, the Supreme Court of Virginia held in *Envirotech Corp. v. Halco Engineering, Inc.*, 364 S.E.2d 215, 220 (Va. 1988), that "an exclusion of consequential damages survives a finding that a limited remedy has failed of its essential purpose." In *Envirotech*, the trial court ruled at the conclusion of evidence that a consequential damages exclusion was not unconscionable, but, still submitted to the jury the questions of whether the remedy provided in the contract failed of its essential purpose and whether consequential damages should not be excluded. The Supreme Court of Virginia ruled that the trial court erred, finding that once it is determined that a consequential damages exclusion is not unconscionable, consequential damages are not recoverable under any circumstances, even if the contract's remedy fails of its essential purpose.

20

Here, because the court has determined that the consequential damages exclusion is not unconscionable, the question of whether the provision fails of its essential purpose is immaterial. Therefore, there is no issue of material fact as to whether the 2005 Supply Agreement properly excluded consequential damages.

**D. Indemnification**

In Count II the Trustee alleges that as a result of DVP's termination of the 2005 Supply Agreement the Debtor "incurred and will continue to incur damages, costs, losses, liabilities, expenses and attorneys' fees as a result of claims and demands by the States of West Virginia and Maryland for environmental reclamation." The Trustee seeks indemnity from DVP for these expenses.

DVP argues such damages are consequential damages that are specifically excluded by by the 2005 Supply Agreement.

Article 11.11(b) of the Agreement describes DVP's agreement to indemnify the Debtor:

Buyer agrees to indemnify, save harmless and, at Seller's sole option, defend Seller and Seller's directors, officers and employees from and against all claims, demands, damages, costs, losses, liabilities, expenses, attorneys' fees (including attorneys' fees and costs relating to appellate proceedings), in any manner arising out of, resulting from, caused by or in connection with any of Buyer's performance hereunder or the performance of its subcontractors and suppliers of any tier, including but not limited to personal injury or death to persons and damage to Buyer's or Seller's property or facilities, or the property of any other person including Buyer's or Seller's employees. However, nothing herein shall be construed as making Buyer liable for any injuries, deaths, or damage caused by the sole negligence of Seller.

This language must be read together with the limitation of liability provision in Article 9.7, which states:

. . . NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS, OR OTHER BUSINESS INTERRUPTION DAMAGES, WHETHER BY STATUTE, IN TORT OR IN CONTRACT, UNDER THIS AGREEMENT, ANY TRANSACTION, ANY INDEMNITY PROVISION OR OTHERWISE.

The court must give effect to every provision of the bargain the parties chose to make in executing the 2005 Supply Agreement. The presumption is that words are not used "aimlessly

21

and that no provision is merely a superfluity unless it is plainly a repetition." 4A *Michie's Jurisprudence of Va. & W. Va., Contracts*, § 48 (citing *Ames v. American Nat. Bank*, 176 S.E. 204 (1934); *American Health Ins. Corp. v. Newcomb*, 91 S.E.2d 447 (1956)).

Article 11.11(b), expressly provides that DVP agrees to indemnify the Debtor against damages arising out of performance of the 2005 Supply Agreement. Consequential and incidental liabilities that arise out of a parties' breach of contract are not expressly included in the indemnity agreement, but the use of the phrase, "including but not limited to," leaves open the possibility that the parties intended to include such damages.

However, such an interpretation would render superfluous the limitation of liability provision in Article 9.7. In particular, the court has determined that the parties agreed under Article 9.7 to exclude a wide scope of otherwise available contract remedies. Although damages for environmental reclamation and other liabilities to third-parties are excluded as consequential damages, those are the very damages against which the Trustee seeks indemnification from DVP. Thus, the Trustee's interpretation of the contract does not give effect to both the indemnity agreement in Article 11.11(b) and the broad damages exclusion in Article 9.7. In effect, the Trustee's interpretation renders the consequential damages exclusion under Article 9.7 superfluous.

The court cannot as a matter of law give the contract the effect suggested by the Trustee. Instead, Article 9.7 excludes the damages the Trustee seeks by way of indemnity in Article 11.11(b).

## IV. CONCLUSION

The 2005 Supply Agreement is clear and unambiguous as to whether the Debtor had triggered an Event of Default at the time DVP sent its termination letter on February 22, 2006. However, the Trustee raises genuine issues of material fact as to whether DVP waived or should be estopped from asserting the Debtor's insolvency as a defense to the Trustee's breach of contract action. Therefore, the court will deny summary judgment as to the Trustee's Count I for breach of the 2005 Supply Agreement and Count III for breach of the Settlement Agreement.

The court will grant summary judgment as to the meaning of the consequential damages exclusion in Article 9.7 of the 2005 Supply Agreement in that the contract language clearly and unambiguously excludes consequential damages and, in particular, damages for environmental

reclamation and third-party breach liabilities prayed for in the Trustee's complaint.

The court finds that the indemnity agreement contained in the 2005 Supply Agreement does not cover the damages sought in the Trustee's Count II.  Therefore, the court will grant DVP's motion for summary judgment on Count II.  For that reason, the court does not need to reach the question of whether the Trustee is time-barred from asserting an indemnification demand.

The court will enter a separate order pursuant to Fed. R. Bankr. P. 9021 that grants in part and denies in part DVP's Motion for Summary Judgment.