Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge
Dated: Tuesday, January 26, 2010 1:45:19 PM

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BUFFALO COAL COMPANY, INC., | ) | Case No. 06-366 |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| | ) | |
| JOHN W. TEITZ, Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 08-41 |
| | ) | Administratively Consolidated with Adv. |
| | ) | Proc. No. 08-38 |
| VIRGINIA ELECTRIC POWER | ) | |
| COMPANY, INC. | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Virginia Electric and Power Company, d/b/a Dominion Virginia Power ("DVP"), seeks summary judgment on Count III of the adversary complaint filed against it by John W. Teitz, the Chapter 7 trustee for Buffalo Coal Company, Inc. (collectively, the "Debtor"). Count III of the Debtor's complaint alleges that DVP tortiously interfered with a coal supply agreement executed between the Debtor and Mount Storm Coal Supply, LLC ("MSCS").

For the reasons stated herein, the court will grant DVP's motion for summary judgment

### I. STANDARD OF REVIEW

Summary judgment is appropriate when the matters presented to the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *Celotex v. Catrett*, 477 U.S. 317, 322

(1986). The party moving for summary judgment has the initial burden of proving that there is no genuine issue as to any material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 161 (1970). Once the moving party has met this initial burden of proof, the non-moving party must set forth specific facts sufficient to raise a genuine issue for trial and may not rest on its pleadings or mere assertions of disputed facts to defeat the motion. *Matsushita Electric Industrial Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (stating that the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts"). The mere existence of a scintilla of evidence in support of the opposing party's position will not be sufficient to forestall summary judgment, but "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In ruling on a motion for summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. A fact is not "genuinely disputed" unless the factual conflict between the parties requires a trial of the case for resolution. *Finley v. Giacobbe*, 79 F.3d 1285, 1291 (2d Cir. 1996) ("If there is any evidence in the record from which a jury could draw a reasonable inference in favor of the non-moving party on a material fact, this Court will find summary judgment is improper.").

## II. BACKGROUND

On January 14, 2005, DVP and MSCS executed a Coal Consulting Agreement whereby DVP promised to inform MSCS about sources of coal, coal purchasing strategies, and coal suppliers. In addition, DVP promised to assist in the negotiations and discussions regarding MSCS's coal supply contracts, the scheduling coal shipments to MSCS by its suppliers, and enforcing the supply contracts.

Like MSCS, DVP was also the recipient of coal. On October 27, 2005, DVP executed a coal supply agreement with the Debtor. In accordance with DVP's Coal Consulting Agreement with MSCS, it also advised MSCS to execute a November 2005 coal supply agreement with the Debtor (the "Synfuel Feedstock Agreement"). In the event that the Debtor sold coal to MSCS under the Synfuel Feedstock Agreement, that sale automatically reduced, on a corresponding basis, the quantity of coal that DVP was or remained obligated to purchase from the Debtor under the DVP-Debtor coal supply agreement.

On February 22, 2006, DVP terminated its coal supply agreement with the Debtor. DVP

-2-

states that its termination was based on the Debtor's insolvency and inability to pay debts when due. DVP informed MSCS of that termination and stated that MSCS would no longer be receiving coal from the Debtor. Under DVP's direction, MSCS then terminated the Synfuel Feedstock Agreement.

### III. DISCUSSION

The Debtor asserts that DVP acted improperly and dishonestly in making statements to MSCS about DVP's termination of its Coal Supply Agreement with the Debtor, and that DVP caused MSCS to terminate the Synfuel Feedstock Agreement in an unjustified manner.

DVP claims that its statements to MSCS were made honestly, and its actions in instructing MSCS to terminate the Synfuel Feedstock Agreement were authorized and proper under its Coal Consulting Agreement with MSCS.

In Syllabus Pt. 2 of *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 314 S.E.2d 16 (W. Va. 1984),[1] the Court set forth the requirements to establish *prima facie* proof of tortious interference with contract and further outlined the contours of the tort:

> (1) existence of a contractual or business relationship or expectancy;
>
> (2) an intentional act of interference by a party outside that relationship or expectancy;
>
> (3) proof that the interference caused the harm sustained; and
>
> (4) damages.
>
> If a plaintiff makes a *prima facie* case, a defendant may prove justification or privilege, affirmative defenses. Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper.

*Id.*

---

[1] DVP has asserted that West Virginia law applies to the Debtor's claim for tortious interference with contract on the basis that any alleged injury resulting from the tort would have occurred in West Virginia and the Synfuel Feedstock Agreement was performed in West Virginia. The Debtor does not dispute DVP's determination as to the applicable state law.

Even assuming (without admitting) that the above four elements necessary to establish a *prima facie* case for tortious interference with contract are present in this case, DVP asserts that it has an absolute defense to any such tort claim because its advice to MSCS to terminate the Synfuel Feedstock Agreement is honest advice rendered within the scope of its Coal Consulting Agreement with MSCS. DVP bears the burden of proof on this issue. *E.g.*, *id.*; Syllabus Pt. 2, *Bryan v. Massachusetts Mut. Life Ins. Co.*, 364 S.E.2d 786 (W. Va. 1987) (stating that a defendant on a tortious interference with contract claim has the burden to prove justification or privilege).

The so-called "consultant's privilege" or "honest advice" defense to a claim of tortious interference with contract requires that the advice be honest and within the scope of the request for advice. *Torbett*, 314 S.E.2d at 215-16; *Restatement (Second) Torts* § 772 (1979).[2] The defense is necessary because "[i]t would cast quite a large, dark cloud over the consulting business if consultants could be hauled into court for having given advice that in hindsight could be characterized as having been ill-advised, ill-informed, or otherwise negligent." *J.D. Edwards & Co. v. Podany*, 168 F.3d 1020, 1022 (7th Cir. 1999). The defense is lost, however, if the advice is not within the scope of the request for advice, or is dishonest. *Restatement (Second) Torts* § 772. If the requested advice is honest, "it is immaterial that the actor also profits by the advice or that he dislikes the third person and takes pleasure in the harm caused to him by the advice." *Id.* at cmt. (c).

Regarding the scope of MSCS's request for advice, it is set forth in the Coal Consulting

---

[2] In *Tiernan v. Charleston Area Med. Ctr., Inc.*, 506 S.E.2d 578, 593 n.26 (W. Va. 1998), the Supreme Court of Appeals of West Virginia affirmed its decision in *Torbett*, *supra*, and held that it "adopt[ed] § 722 of the Restatement in its entirety." The Restatement provides:

> One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person
>
> (a) truthful information, or
>
> (b) honest advice within the scope of a request for the advice.

§ 722.

-4-

Agreement between DVP and MSCS. The Agreement was executed, in part, because MSCS desired to retain DVP to "locate and arrange an adequate supply of feedstock coal and to ensure that [MSCS] purchases coal that conforms to Coal Quality Standards." (Doc. No. 357, Ex. 2, p.5). Under the Agreement, DVP was to act as an "independent contractor" (*Id*. at §§ 4.1, 5.1). DVP's duties under the Agreement are outlined in Article VI:

> SECTION 6.1 <u>Provision of Nonspecified Coal Consulting Services</u>.
>
> [DVP] shall, at the reasonable request of [MSCS] . . . provide any additional services related to the purchase of coal to the Facility . . . .
>
> SECTION 6.2 <u>Explanatory Information</u>.
>
> (a)     [DVP] shall (i) provide to [MSCS] information regarding sources of coal that will enable [MSCS] to obtain coal that will, at a minimum, meet the Coal Quality Standards . . . (ii) assist [MSCS] . . . by providing certain recommendations and certifications . . . and (iii) assist [MSCS] in exercising [MSCS's] remedies with respect to the delivery of coal under a Supplier Contract that does not conform to the requirements of such contract. . . .
>
> SECTION 6.3 <u>Selection and Purchase of Coal</u>.
>
> . . . .
>
> (c)     [DVP] and [MSCS] will consult on a regular basis . . . to discuss the performance of the coals being acquired, current inventory levels, proposed shipment schedules, and coal purchasing strategies. . . .
>
> (d)     [DVP] shall use commercially reasonable efforts to arrange and present to [MSCS] for approval and acceptance Supplier Contracts . . . . [DVP] shall assist [MSCS] in the identification of potential suppliers of coal . . . and shall advise and assist [MSCS] in evaluating all bids received . . . .
>
> (e)     [DVP] shall assist [MSCS] in administering the Supplier Contracts, including scheduling and coordinating orders and deliveries with Suppliers to the Station, pricing determinations, arbitrations, and other enforcement actions under or pursuant to such coal contracts.

(*Id.* at art. VI).

According to the Debtor, the facts of this case relevant to evaluating DVP's defense of

–5–

honest advice rendered within the scope of MSCS's request for advice are as follows: (1) at 5:12 p.m. on February 22, 2006, DVP terminates the coal supply agreement between itself and the Debtor; (2) in the late afternoon on February 22, 2006, DVP informs MSCS that the Synfuel Plant would no longer receive coal from the Debtor and that the coal supply agreement between DVP and the Debtor was terminated; (3) on the morning of February 23, 2006, DVP speaks directly to MSCS's management and notifies MSCS that it will no longer be receiving coal from the Debtor; (4) at 10:43 a.m. on February 23, 2006, DVP states to MSCS that its counsel is preparing appropriate notices regarding termination of the Synfuel Feedstock Agreement; (5) at 11:40 a.m., MSCS's counsel emails MSCS and asks how DVP could just "shut off" its supply of coal from the Debtor; (6) at 5:23 p.m., DVP provides MSCS a form letter for termination of the Synfuel Feedstock Agreement, tells MSCS to print the letter on its letterhead, and have it signed.

According to the Debtor, DVP did more than merely offer advice regarding termination of the Synfuel Feedstock Agreement; DVP outright instructed MSCS to terminate the Agreement and then put the termination into motion by directly informing the operators of the Synfuel Plant that they would not be receiving any more coal from the Debtor. In the Debtor's view, DVP "commandeered," and "orchestrated" the termination of the Synfuel Feedstock Agreement such that its actions were outside the scope of the Coal Consulting Agreement. The Debtor also argues that the Coal Consulting Agreement did not specifically authorize DVP to "assist in pursuing any remedies" such as termination.

The court, however, cannot conclude that DVP's communications or actions fell outside of the consultant's privilege to interfere with the contracts of its client. Section 6.2(a) of the Coal Consulting Agreement obligates DVP to provide MSCS with information regarding coal supply sources, § 6.3(c) obligates DVP to consult on a regular basis with MSCS on the coals being acquired by it, and § 6.3(e) requires DVP to assist MSCS in administering supplier contracts – including enforcement actions under those contracts. Regarding termination actions, § 6.3(e) of the Agreement specifically states that "[DVP] shall assist [MSCS] in administering the Supplier Contracts, *including* scheduling . . . orders and delivers . . . pricing determinations, arbitrations, and *other enforcement actions* under or pursuant to such coal contracts." (Emphasis added). This plain language is broad enough to incorporate a request by MSCS to DVP to advise and assist it with any termination of the Synfuel Feedstock Agreement.

–6–

In fact, MSCS also contemplated that such enforcement actions included termination, as evidenced by a February 23, 2006, email from Kirby Martin at MSCS to Keith Carney at DVP that states, "I am requesting [DVP] to furnish [MSCS] with any required documentation relative to [MSCS's] termination [of the Synfuel Feedstock Agreement]." (Document No. 357, Ex. 10). Mr. Martin also testified that MSCS relied on DVP to administer its coal supply contracts from "cradle to grave" and that he expected DVP to assist in enforcement actions such as termination. (Document No. 357, Ex. 3, p. 165-67). Consequently, the court finds that DVP's communications to MSCS regarding its termination of its own coal supply agreement with the Debtor, DVP's communication that MSCS would no longer be receiving coal from the Debtor, and its instructions regarding the termination of the Synfuel Feedstock Agreement all fall within the requested scope of advice as set forth in the Coal Consulting Agreement.

Regarding the existence of "honest advice" the Debtor asserts that DVP's communications with MSCS were neither truthful nor honest. DVP informed MSCS that it would not be receiving any more coal from the Debtor, but on the morning of February 23, 2006, the Debtor made two deliveries of coal. The Debtor also expected to reorganize its future business around its coal supply contract with MSCS and obtain financing on that basis. The Debtor asserts that without DVP's actions, it would have continued to service the Synfuel Feedstock Agreement.

DVP's advice under the Coal Consulting Agreement consisted of an explanation of the basis for DVP's termination of its supply contract with the Debtor, and on how MSCS could terminate the Synfuel Feedstock Agreement. Indeed, the grounds for DVP's termination of its coal supply agreement with the Debtor – that the Debtor was insolvent and not paying debts when due – was also a basis for termination of the Synfuel Feedstock Agreement.[3] Although the Debtor states that DVP failed to provide "truthful and proper information" to MSCS regarding the termination of the Synfuel Feedstock Agreement, absolute truth is not required as an element of the "honest advice"

---

[3] The "Events of Default, Early Termination and Limitation of Liability" provisions of the Synfuel Feedstock Agreement and the coal supply agreement between DVP and the Debtor are identical. (*Cf.* Document No. 357, Ex. 7 § 9.1 *with* Ex. 8, § 9.1). Kirby Martin, an officer of MSCS, testified that MSCS had no independent knowledge of the Debtor's insolvency or inability to pay debts when due – MSCS was completely relying on DVP as its coal consultant for that information. (Document N. 357, Ex. 3, p. 119).

–7–

defense to a tortious interference claim.[4] Under the *Restatement (Second) Torts* § 772, wholly adopted by the Supreme Court of Appeals of West Virginia in *Tiernan*, 506 S.E.2d at 593, "truthful information" is one defense to a tortious interference claim, and "honest advice within the scope of the request for advice" is another, disjunctive defense. As recognized by the Court of Appeals for the Seventh Circuit, advice that, in hindsight, proves to be ill-informed or ill-advised or even negligent is protected as "honest advice" because without such protection there would exist "a large, dark cloud over the consulting business . . . ." *J.D. Edwards & Co.*, 168 F.3d at 1022. Advice does not have to be correct, it just has to be honest.

Here, DVP believed that the information it had regarding the Debtor's insolvency and inability to pay debts when due was sufficient to support its own termination of the DVP-Debtor coal supply agreement, and it was aware that the Synfuel Feedstock Agreement had an identical termination provision.[5] The mere fact that the Debtor made two deliveries of coal to MSCS on the same day DVP informed MSCS that the Synfuel Feedstock Agreement would be terminated, and that it would no longer be receiving coal from the Debtor, does not render DVP's advice dishonest. Gerald Ramsburg, a former officer and owner of the Debtor, details in his affidavit the financial problems of the Debtor and its contemplated bankruptcy filing. (Document No. 390, Appx. P). Additionally, the Debtor expressly does not dispute that it was forced to cease operations as a result of DVP's termination of the DVP-Debtor coal supply agreement. (Document No. 389, ¶ 32). Consequently, the court believes that DVP had ample grounds on which to base its advice to MSCS

---

[4] In Syllabus Pt. 2 of *Torbett*, 314 S.E.2d 16, the Supreme Court of Appeals of West Virginia described the application of the consultant's privilege (§ 722(b) of the Restatement) as one that requires the rendering of "honest, truthful requested advice." This point was later clarified in *Tiernan*, 506 S.E.2d at 593, when the Court stated that its formulation in *Torbett* was correct "within the confines of that case," but, *Torbett* had not fully adopted § 722(a) of the Restatement that provided a defense based on the offering of unsolicited, truthful advice. By adopting § 722 of the Restatement in its entirety, *Tiernan* perforce eliminated any requirement in West Virginia that the consultant's privilege stated in § 722(b) of the Restatement be both honest and truthful. Consistent with § 722(b) of the Restatement, a consultant's advice need only be "honest advice within the scope of the request for the advice."

[5] In an earlier decision, *Teitz v. Va. Elec. & Power Co. (In re Buffalo Coal Co.)*, No. 08-38, 2009 Bankr. LEXIS 3033 (Bankr. N.D.W. Va. Sept. 30, 2009), the court determined that DVP had sufficient evidence of an event of default on which to base its termination of its 2005 coal supply agreement with the Debtor.

-8-

that the Debtor was insolvent, unable to pay its debts when due, and that a basis existed for termination of the Synfuel Feedstock Agreement. DVP's advice to MSCS was honest.

## IV. CONCLUSION

The court will grant DVP's motion for summary judgment and dismiss Count III of the Debtor's Amended Complaint. All other counts of the Amended Complaint having been settled, the court will enter a separate order under Fed. R. Bankr. P. 9021 that grants the motion for summary judgment and dismisses this adversary proceeding.