Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge
Dated: Monday, February 08, 2010 3:37:26 PM

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN RE: | |
| UNITED ENERGY COAL, INC., | Case No. 06-453 |
| Debtor. | Chapter 7 |
| H. LYNDON GRAHAM, Trustee, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 08-45 |
| | Administratively Consolidated with Adv. Proc. No. 08-38 |
| VIRGINIA ELECTRIC POWER COMPANY, INC. | |
| Defendant. | |

## **MEMORANDUM OPINION**

Virginia Electric Power Company, Inc. ("DVP"), seeks entry of summary judgment on the claim of H. Lyndon Graham, the Chapter 7 trustee of United Energy Coal, Inc. (collectively, the "Debtor"), that DVP tortiously interfered with either an oral coal supply agreement or business expectancy between the Debtor and Buffalo Coal Company, Inc., when DVP terminated a coal supply agreement it had with Buffalo Coal. The Debtor asserts that as a consequence of DVP's termination of the DVP-Buffalo Coal supply contract, Buffalo Coal was forced out of business, the Debtor became liable upon its guarantee of Buffalo Coal's performance under that contract, Buffalo Coal was unable to pay its debts to the Debtor, and Buffalo Coal was no longer able to purchase the Debtor's coal.

For the reasons stated herein, the court will grant DVP's motion for summary judgment.

## I. STANDARD OF REVIEW

Summary judgment is appropriate when the matters presented to the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment has the initial burden of proving that there is no genuine issue as to any material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 161 (1970). Once the moving party has met this initial burden of proof, the non-moving party must set forth specific facts sufficient to raise a genuine issue for trial and may not rest on its pleadings or mere assertions of disputed facts to defeat the motion. *Matsushita Electric Industrial Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (stating that the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts"). The mere existence of a scintilla of evidence in support of the opposing party's position will not be sufficient to forestall summary judgment, but "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In ruling on a motion for summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. A fact is not "genuinely disputed" unless the factual conflict between the parties requires a trial of the case for resolution. *Finley v. Giacobbe*, 79 F.3d 1285, 1291 (2d Cir. 1996) ("If there is any evidence in the record from which a jury could draw a reasonable inference in favor of the non-moving party on a material fact, this Court will find summary judgment is improper.").

## II. BACKGROUND

From 1999 to 2006, the Debtor operated several surface and deep coal mines. The Debtor estimates that about half of its coal production was supplied to a power plant in Cumberland, Maryland, and the rest was supplied to other markets. Some of the Debtor's coal was shipped to a related company, Buffalo Coal.[1] The Debtor contends that Buffalo Coal would use the Debtor's coal shipments to assist Buffalo Coal in meeting its own coal supply obligation to DVP.[2] Buffalo

---

[1] The Debtor and Buffalo were under common control through ownership interests.

[2] DVP contends that all the coal allegedly sold by the Debtor to Buffalo Coal was pursuant to a supply contract the Debtor had with PBS Coals. That supply contract required the

-2-

Coal was located in close proximity to DVP's coal burning electric power station and DVP was Buffalo Coal's primary customer.

To secure the supply of coal to its power station, DVP executed a January 1, 2002 coal supply agreement ("First Supply Agreement") with Buffalo Coal. Problems arose between Buffalo Coal and DVP regarding the First Supply Agreement, and on October 24, 2005, the parties settled their differences and executed a new coal supply agreement ("Second Supply Agreement") that was designed to last for five years. In executing the Second Supply Agreement, DVP agreed to forego asserting its claim for $34.8 million in damages for Buffalo Coal's alleged breach of the First Supply Agreement, so long as Buffalo Coal performed its obligations under the Second Supply Agreement. DVP also agreed to increase the price it was paying for Buffalo's coal. The Debtor guaranteed Buffalo Coal's performance under the Second Supply Agreement.

On February 22, 2006, DVP terminated the Second Supply Agreement on the grounds that Buffalo Coal was insolvent and unable to pay its debts as they fell due. After receiving the termination notice, Buffalo Coal ceased its business operations. Buffalo Coal filed bankruptcy on May 5, 2006. At that time, Buffalo Coal stated that it owed the Debtor about $2.3 million.

On March 3, 2006, DVP sent an invoice to the Debtor, as the guarantor under the Second Supply Agreement, for $56,370,521, representing the contractual "termination payment" due to it. The Debtor filed bankruptcy on May 31, 2006.

## III. DISCUSSION

In its Amended Complaint, the Debtor asserts that it had a contractual or business expectancy in a coal supply contract with Buffalo Coal, that DVP interfered with that contract or expectancy when it terminated the Second Supply Agreement with Buffalo Coal, and that DVP's action caused Buffalo Coal to be unable to pay a $2.3 million debt owed by it to the Debtor, which resulted in the Debtor's bankruptcy filing. The alleged motive for terminating the Second Supply Agreement, destroying Buffalo Coal's ability to continue its business, and for destroying the Debtor's business,

---

Debtor's coal shipments be sent to Buffalo Coal's preparation plant before being shipped to PBS Coals. In turn, PBS Coals sold it to DVP.

was so that DVP could assert its claim for damages against Buffalo Coal and the Debtor[3] in lieu of continuing to perform under the Second Supply Agreement.

In its motion for summary judgment, DVP asserts, among other things, that no on-going contract between Buffalo Coal and the Debtor existed when it terminated the Second Supply Agreement (or had ever existed); consequently, it cannot have interfered with a non-existent supply contract. Additionally, DVP asserts that the undisputed facts of the case are insufficient to satisfy the elements of a claim for tortious interference with a prospective business advantage.

**A.    Tortious Interference with Contract**[4]

Essential to the Debtor's claim that DVP tortiously interfered with its alleged oral coal supply contract with Buffalo Coal is that the alleged contract actually exist.  *E.g.*, *Ultrasound Imaging Corp. v. Am. Soc'y of Breast Surgeons*, 358 F. Supp. 2d 475, 479 (D. Md. 2005) (reciting that an essential element for a tortious interference with contract claim is that a contract actually exist).

The Debtor states that it was obligated to supply Buffalo Coal with 120,000 tons of coal per year at $19 per ton. The duration of the oral agreement was to coincide with Buffalo Coal's 5-year obligation under its Second Supply Agreement with DVP. This assertion comes directly from the

---

[3] DVP's damage claim totals about $90 million. This amount represents what DVP asserts is due from Buffalo Coal's breach of the First Supply Agreement ($34 million), and what it claims is owed from termination of the Second Supply Agreement ($56 million). Of this amount, DVP is only asserting that the Debtor is liable for $56 million as a guarantor of the Second Supply Agreement.

[4] Both parties agree that the Debtor's claim for tortious interference is governed by Maryland law. Under Maryland law, "[t]ortious interference with business relationships arises only out of the relationships between three parties, the parties to a contract or other economic relationship (P and T) and the interferer (D)." *K & K Management, Inc. v. Lee*, 557 A.2d 965, 973 (Md. Ct. App. 1989). As the court in *K & K Management* explained, there exists "'two general types of tort actions for interference with business relationships,'" which are: "'[1] inducing the breach of an existing contract and, more broadly, [2] maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract.'" *Id.* (citation omitted).

December 17, 2009 affidavit of Gerald Ramsburg, a former officer of both the Debtor and Buffalo.[5] Mr. Ramsburg's statement is consistent with a September 2005 business plan, prepared for Buffalo Coal by George Brikis, that projects that Buffalo will receive 120,000 tons of coal per year from 2006-10 from the Debtor. It is also consistent with Mr. Ramsburg's earlier deposition testimony inasmuch as he testified that he understood Mr. Brikis' projection for the future sale of coal from the Debtor to Buffalo to be a contractual relationship. (Document No. 421-2, Ramsburg Depo., p. 374-79).

Mr. Ramsburg's legal conclusion that a long term supply contract existed between the Debtor and Buffalo Coal, however, is belied by the underlying, undisputed facts on which that conclusion is based.

The facts underlying Mr. Ramsburg's conclusion that a long term, oral coal supply contract existed between the Debtor and Buffalo Coal are set forth in his May 20, 2009 deposition. In that deposition, Mr. Ramsburg states that no definite price existed for the sale of coal, no obligation ever existed for the Debtor to supply coal to Buffalo Coal, or for Buffalo Coal to purchase the Debtor's coal:

> Q: In your experience with Buffalo Coal, are you aware of any evidence in Buffalo Coal's books or records of an oral contract between United Energy and Buffalo Coal?
> A: Well, nothing other than the fact that we had on-going coal shipments and payments due to United . . . .
> . . . .
> Q: But are there terms of this alleged oral contract?
> A: Well, there's certainly, if you would look at the Quickbooks, it would show you the price that we paid for each ton . . . .
> . . . .

---

[5] Mr. Ramsburg states in his affidavit:

> United sold coal to Buffalo in the years 2001, 2002, 2003, 2004, 2005, and 2006 as part of a long term supply contract with Buffalo. Beginning in October 2005, the United-Buffalo agreement was for a five year term in order to coincide with the October 2005 Coal Supply Contract between Buffalo and [DVP]. The United-Buffalo agreement was for 120,000 tons per year at $19 per ton, and was not terminable at will.

(Document No. 421-10, ¶ 2).

–5–

> Q: But I mean did you negotiate a contract, or was there just an understanding that the two companies were going to work together and from time to time to supply coal and money, cash to each other?
> A: Well there was always the fact that United was going to be sending coal to Buffalo.
>    . . . .
> Q: But in terms of – was United under any obligation to deliver a specific sum of coal to Buffalo at any time?
> A: No, it was just whatever United produced, like subquality, that's what we would take to Buffalo.
>    . . . .
> Q: Who were the individuals that entered in this oral contract?
> A: Just Chuck and I.
>    . . . .
> Q: So did somebody say, "I'm going to be United, and you be Buffalo, and lets have an oral agreement?"
> A: No, we both owned the same stock in the same companies all the time, so it was just something that we knew it was good for United, and it certainly didn't hurt Buffalo, because Buffalo made a percentage off of it.
>    . . . .
> Q: Is there any reference to this alleged oral contract in any of United's books?
> A: No, just payments.
>    . . . .
> Q: [Regarding coal sales between United and Buffalo, was there] a specific arrangement for a specific price, specific quantity over a specific duration?
>    . . . .
> A: We were always going to pay what we thought was their cost, of whoever was moving the coal in whichever direction, plus a slight, you know, premium to whomever. There was also Buffalo coal that came to United at times.
> Q: Was there any obligation on behalf of United to supply coal to Buffalo?
>    . . . .
> A: None . . . . Not that I am aware.
> Q: Was there any obligation that Buffalo ha[d to] buy a specific sum of coal from United?
> A: No.

(Document No. 421-2, Ramsburg Depo. p. 334-43).

Accordingly, the "contract" being referred to by Mr. Ramsburg is one in which there is no obligation to supply coal, no obligation to purchase coal, and no specific time allotted for any performance. Mr. Ramsburg would not even commit to a price; he stated that the price of coal per ton changed "every time we had a new trucking contract or every time we had a new price

-6-

escalator."[6] (*Id.* at 338-39). When a party has an unlimited right to determine how to perform, or whether to perform at all, that right negates any promise to perform and the relationship is not one that is based on contractual principles. *E.g.*, *Cheek v. United Healthcare of the Mid- Atl., Inc.*, 835 A.2d 656, 661 (Md. Ct. App. 2003) ("Without a binding obligation, sufficient consideration does not exist to support a legally enforceable agreement.").

Apart from Mr. Ramsburg's testimony regarding the existence of what he believed to be a contract, the record is full of references to a business relationship between the Debtor and Buffalo Coal, but devoid of evidence of an on-going supply contract. For example, Schedule G of the Debtor's bankruptcy petition – listing all executory contracts – fails to list any current or on-going coal sale contract with Buffalo Coal. Schedule B of the Debtor's petition lists accounts receivable as "unknown," but Schedule F of Buffalo Coal's bankruptcy petition, listing its unsecured debts, states that a $2.3 million debt owed to the Debtor, which is presumably based in part on the alleged coal sales.

Additionally, Paul Goad, whom DVP hired to issue a report on Buffalo Coal, stated in his deposition that the principals of the Debtor and Buffalo informed him that they were taking the Debtor's coal and shipping it to DVP in an attempt to fulfill Buffalo Coal's supply obligations to DVP under the Second Supply Agreement. Mr. Goad's report reflects that the Debtor, historically, had supplied Buffalo Coal with 10,000 to 20,000 tons of coal per month. A report by KPMG, ordered by DVP to investigate the affairs of Buffalo Coal, reflected similar information. Likewise, Benjamin Baughan, an employee of DVP, stated that following a May 3, 2005 meeting with Buffalo Coal's principals, he was informed that the Debtor could produce 500,000 to 600,000 tons of coal per year, and after fulfilling its supply obligations to other customers, would be able to sell its coal (about 20,000 tons per month) to Buffalo Coal to supplement its requirement to ship coal to DVP. William Miller, a potential fiancier of Buffalo Coal, stated in his deposition that "everyone knew" Buffalo Coal was purchasing coal from the Debtor. Many invoices exist showing coal sales from the Debtor to Buffalo Coal.

While the above facts plainly represent that business dealings existed between the Debtor

---

[6] A review of the invoices sent by the Debtor to Buffalo Coal from 2005 reflect that the price per ton of coal varied between $6.53 and $25. There does not appear to be any invoice in 2005 reflecting a price of $19 per ton.

–7–

and Buffalo Coal, they do not reflect that the two companies had an on-going coal supply contract. The closest reference to a continuing oral coal supply contract between the Debtor and Buffalo Coal is set forth in Buffalo Coal's financial projections from 2006 to 2010, which were prepared by George Brikis. Mr. Birkis states that Buffalo Coal planned to purchase $120,000 tons per year from the Debtor at $19 per ton. In his deposition, Mr. Brikis explained his basis for making that statement:

> Q: [W]as Buffalo Coal under any obligation to purchase any coal from United?
> . . . .
> A: I never saw the contract anyway, so I don't know what it said.
> Q: Do you know if there was a contract?
> A: I just know from looking at United's financials and looking at Buffalo's financials that United was selling coal to somebody, and it was going over to Buffalo, so coal sales were taking place. Under what arrangement, I don't know. Whether it was a handshake, verbal, contract, I don't know. . . . I never saw anything on paper other than the financials which showed me that coal was being sold, and, when asking Chuck, it was being sold to Buffalo. That's all I had to go by. I didn't see any formal arrangement, contract, quantity, price. I never saw anything like that in writing.

(Document No. 421-25, Brikis Depo. p. 242-43).

Thus, the statement of Mr. Brikis regarding Buffalo Coal's projected coal purchases from the Debtor was not based on a historical contract, an existing contract, or a contract that Buffalo Coal and the Debtor were planning to execute. Instead, Mr. Brikis's projection was based on historical operations of the Debtor and Buffalo Coal. When asked about Mr. Brikis's projections in his May 20, 2009 deposition, Mr. Ramsburg stated that he characterized the projection as a contract and that he intended for both the Debtor and Buffalo Coal to fulfill that contract. However, Mr. Ramsburg also stated that the projection of Mr. Brikis wasn't anything new; rather, it was just a reflection of the continuing business model that had existed at Buffalo Coal from 2001 through 2006:

> Q: . . . . "The projections assume 120,000 tons per year are purchased from an affiliate at $19 per raw ton (purchased from United Energy Coal, Inc.)." Correct?
> A. Yes.
> Q: And Mr. Brikis wrote that in his report . . . .[based] on information he received from you, correct?
> A. Yes.

-8-

> . . . .
> Q: And you would characterize this as a contract between United Energy and Buffalo Coal to make available 120,000 tons per year at $19 per raw ton, correct?
> . . . .
> A. Yes.
> . . . .
> Q: And this really wasn't anything new, was it Mr. Ramsburg?
> . . . .
> A: No.
> Q: This was simply a continuation of the business model that existed at Buffalo Coal from 2001 through 2006, correct?
> . . . .
> A: Same concept, yes, sir.

(Document No. 421-2, Ramsburg Depo., p. 374-76).

As Mr. Ramsburg earlier testified, the business model existing between 2001 and 2006 between the Debtor and Buffalo Coal – upon which the alleged 2006-10 supply contract is based – was one under which neither the Debtor nor Buffalo Coal was obligated to perform, and, thus, failed to create a contractual relationship between them.

In sum, drawing all inferences in favor of the Debtor as the non-moving party on summary judgment, the court can discern no genuine issue of material fact regarding the existence of an on-going coal supply contract between the Debtor and Buffalo Coal that would require a trial for resolution. In reaching this conclusion the court is not weighing conflicting evidence regarding the existence of a contract; rather, the court has examined the grounds relied on by Mr. Ramsburg for his conclusion that a contract existed and has found those grounds insufficient to support his conclusion.[7] Without an existing contract, the Debtor has failed to state a claim for tortious interference with contract.

## B.   **Tortious Interference with Prospective Advantage**

The fact that the Debtor and Buffalo did not have an on-going coal supply contract, however, does not mean that the Debtor and Buffalo did not have a business relationship and an

---

[7] To the extent that Mr. Ramsburg's testimony is conflicting, "'a genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.'" *Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970, 975 (4th Cir. 1990) (citation omitted).

expectancy to do business together in the future. As outlined in Mr. Brikis's report, Buffalo Coal intended to continue purchasing coal from the Debtor during the 2006-10 period. Likewise, Mr. Ramsburg stated that the Debtor intended to continue its historical business relationship with Buffalo Coal.

Under Maryland law, the elements of a claim for tortious interference with prospective advantage are: "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiff[] in [its] lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." *Carter v. Aramark Sports and Entm't Servs., Inc.*, 835 A.2d 262, 279-80 (Md. Ct. App. 2003). Regarding the existence of intent and purpose, interference can be intentional if the actor knows that the interference is substantially certain to occur as a result of his action. *Restatement (Second) Torts* § 766B cmt. d (1979). Intent alone, however, is not sufficient to support a cause of action – the interference must also be improper. *Id.* As explained by the *Restatement*:

> The factors to be considered in determining whether an interference is improper are stated in § 767.[8] One of them is the actor's motive and another is the interest sought to be advanced by him. Together these factors mean that the actor's purpose is of substantial significance. If he had no desire to effectuate the interference by his action but knew that it would be a mere incidental result of conduct he was engaging in for another purpose, the interference may be found to be not improper. Other factors come into play here, however, particularly the nature of the actor's conduct.

---

[8] Section 767 states:
In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:
    (a) the nature of the actor's conduct,
    (b) the actor's motive,
    (c) the interests of the other with which the actor's conduct interferes,
    (d) the interests sought to be advanced by the actor,
    (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
    (f) the proximity or remoteness of the actor's conduct to the interference and
    (g) the relations between the parties.
*Id.*

> If the means used is innately wrongful, predatory in character, a purpose to produce the interference may not be necessary. On the other hand, if the sole purpose of the actor is to vent his ill will, the interference may be improper although the means are less blameworthy.

*Id.*

In determining if the nature of the actor's conduct is innately wrongful or predatory, Maryland courts look to whether the act might constitute a common law tort, violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and/or the institution or threat of a groundless civil suit or criminal prosecution in bad faith. *Carter*, 835 A.2d at 279-80.

In *K & K Management, Inc. v. Lee*, 557 A.2d 965 (Md. Ct. App. 1989), the court analyzed Maryland's law of tortious interference as it applies to a situation where the defendant prevented the plaintiff from continuing a business relationship with a third party. In that case, the Lees had a restaurant management contract at a motel owned by K & K Management. *Id.* at 966. When K & K Management prematurely terminated the Lees' management contract, the Lees suffered an actual loss of business relations with prospective customers based on the general restaurant operations projected over the balance of the life of the management agreement. *Id.* at 975. Accordingly, "the evidence of actual loss relate[d] to the Lees' broad economic relationships and [was] not premised on interference with one or more specific contracts." *Id.* In discussing whether the loss was compensable under a tortious interference claim, the court stated that K & K Management's purpose or motive in effecting the termination of the Lees' management contract must be for the purpose of interfering with the Lees' relationships with the third party customers – mere tortious intent (as defined by the *Restatement (Second) Torts* § 766B cmt. d) is not sufficient. *Id.* Consequently, [e]ven if the officers of K & K could be found to have tortious intent based on the assumed substantial certainty of interference with [restaurant] customers, there [was] no tort because the evidence [was] uncontradicted that [K &K Management's] purpose or motive in closing the restaurant was not directed at the Lees' relations with their customers." *Id.* In the case, "no reasonable person could conclude . . . that [K & K Management's] purpose in closing . . . the restaurant was an attempt to obtain from themselves the future business of the [restaurant] customers. The Lees's loss of that business . . . was an incidental effect of [K & K Management's]

-11-

breach of the Agreement and not the object or purpose of the breach." *Id.* at 977.

Concerning the nature of DVP's conduct, its motive, and its interest in terminating the Second Supply Agreement, the Debtor argues that DVP knew, when it terminated the Second Supply Agreement with Buffalo Coal and called in the guaranty payment from the Debtor, that the Debtor would be unable to continue to operate because Buffalo Coal's bankruptcy precluded the possibility of Buffalo ever paying the $2.3 million it owed to the Debtor, and that the Debtor would owe DVP $56 million on the guarantee agreement. In the Debtor's view, DVP "orchestrated a scheme" in which it forced the Debtor to dedicate its entire coal reserves to DVP, and to guarantee the financial performance of Buffalo Coal under the Second Supply Agreement, under the "ruse" that DVP would deal in good faith for the duration of the 5-year term of the Second Supply Agreement. Less than six months after execution of the Second Supply Agreement, DVP "lured" Buffalo Coal into contemplating bankruptcy for the sole purpose of terminating the Second Supply Agreement on that basis.

The only relevant testimony in the record concerning the nature of DVP' actions and its motive and intent is from Karla Haslip, an employee of DVP charged with arranging coal shipments to DVP's power plant. Ms. Haslip testified that DVP executed the Second Supply Agreement with Buffalo Coal in October 2005 because DVP "wanted a reliable, dependable supplier and [DVP] wanted more than one supplier up at Mount Storm." (Document No. 421-16, Halsip Depo., p. 117). Another purpose of the 2005 Second Supply Agreement with Buffalo Coal was to provide Buffalo Coal with a "bankable" document that would allow it to get financing for their operations. (*Id.* at 185). DVP's internal documents reflect that it desired to "maintain[] Buffalo as low costs supplier & independent entity." (Document No. 421-15, p. 5). Indeed, the price per ton of coal that DVP agreed to pay Buffalo Coal in the Second Supply Agreement was significantly higher than the price that it had agreed to pay in the First Supply Agreement. According to Ms. Haslip, DVP eventually terminated the Second Supply Agreement with Buffalo Coal because:

> Buffalo notified us that they could no longer operate . . . . [T]hey notified us that they were going to file bankruptcy. . . . We knew that they - - it was proven to us that they were going to go into bankruptcy. We had worked with them forever in attempting to get them reliable and dependable and someone we could count on. It became evident at the point that we were notified that they potentially were never going to be reliable, dependable, and we decided to terminate the contract. That was the best decision based on the information. . . . We terminated it so that we could go out and

-12-

>procure more coal to replace it so that we could guarantee supply. . . . We terminated it because they could not perform and we felt like that going into bankruptcy was only going to make matters worse. We wanted to be - - they weren't performing. We elected to terminate. At the point we terminated we still didn't know who our next supplier was going to be, but at least we would be making those decisions.

(Halsip Depo., 268, 297-98, 299, 301).

Accordingly, the nature of DVP's conduct is that it terminated the Second Supply Agreement with Buffalo Coal – an act based on contract – on the grounds that Buffalo Coal was insolvent and unable to pay its debts when due. The professed motive and intent was to eliminate a supplier that DVP deemed unreliable. Although the Debtor argues that DVP's motive or intent was more sinister – to end its performance obligations and hold the Debtor liable on the guarantee agreement – that argument is not supported in the record. Mr. Ramsburg testified that he was unaware of any way that DVP benefitted from termination of the Second Supply Agreement. Ms. Haslip's testimony and DVP's internal documents reflect a desire of DVP to continue performance under the Second Supply Agreement in that DVP wanted to maintain Buffalo Coal as a low cost supplier and independent entity. Ms. Haslip indicated that DVP would be willing to accept Buffalo Coal as a supplier – even after its termination of the Second Supply Agreement – if a third party with whom DVP had a coal supply agreement had a secondary supply agreement with Buffalo Coal.[9] Moreover, DVP was aware of the Debtor's financial condition before terminating the Second Supply Agreement with Buffalo Coal. In the summer of 2005 DVP hired Ralph Loretta, a KPMG partner, to investigate the

---

[9] The Debtor has failed to demonstrate that DVP engaged in conduct such as violence or intimidation, defamation, injurious falsehoods or other frauds, a violation of the criminal laws, or the institution of groundless civil suits or criminal prosecutions in bad faith. *See Teitz v. Va. Elec. & Power Co. (In re Buffalo Coal Co.)*, No. 08-38, 2009 Bankr. LEXIS 3033 (Bankr. N.D.W. Va. Sept. 30, 2009). Here, DVP terminated a supply contract with Buffalo Coal on the grounds that it was insolvent and unable to pay its debts as they fell due. Factually, DVP's statement regarding Buffalo Coal's financial condition was true, and Buffalo Coal's financial condition was an express "Event of Default" in the Second Supply Agreement that would authorize DVP to terminate the contract. *Id.* Termination of a contract based on established facts that provide an express right of termination is simply not akin to the type of acts – such as violence or intimidation, fraud, or bad faith legal prosecutions – that are required to make a purpose to produce the alleged tortious interference with a prospective business advantage unnecessary. Moreover, no indication exists in the record that DVP was motived by spite, ill-will, or a desire to ruin the Debtor.

relationship between Buffalo Coal and its affiliated companies. Mr. Loretta reported that the Debtor was in a "tenuous cash position" and only had about $51,000 in its bank account. (Document No. 421-20, Loretta Depo., p. 179, 189). Realistically, the Debtor was not an entity against whom DVP could have any hope of recovering $56 million on the guarantee agreement.[10]

Regarding the interest of the Debtor, it had other coal supply agreements in place at the time DVP terminated the Second Supply Agreement with Buffalo Coal. Historically, the Debtor was able to produce less than 45,000 tons of coal per month. The Debtor had coal sales contracts with Lehigh Cement Company for about 16,000 tons a month, Anker Energy for 15,000 to 22,000 tons per month, and to PBS Coals for about 20,000 tons per month. Thus, the Debtor was capable of selling its full monthly coal production to other entities even if it lost Buffalo Coal as a customer.

In sum, the Debtor's argument that DVP wanted to terminate its performance obligations under the Second Supply Agreement by engaging in a nefarious scheme to accuse Buffalo Coal of breach and to hold the Debtor liable on the $56 million guarantee agreement are not supported in the record. The Debtor has failed to show that any interference that DVP's action may have had on the business dealings between the Debtor and Buffalo Coal was improper.

## IV. CONCLUSION

For the above stated reasons, the court will enter a separate order pursuant to Fed. R. Bankr. P. 7058 that grants DVP's motion for summary judgment and that dismisses Count II of the Debtor's adversary complaint.

---

[10] On the Debtor's bankruptcy petition, the Debtor indicated that it had $618,970 in real property, and, excluding its legal claim against DVP, $3,057,000 in personal property. The estimated secured claims against the real and personal property were about $1,551,000.