Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge
Dated: Tuesday, February 16, 2010 8:28:21 AM

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BUFFALO COAL CO., | ) | Case No. 06-366 |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| | ) | |
| JOHN W. ("JACK") TEITZ, trustee of the estate of BUFFALO COAL CO., | ) ) | |
| | ) | |
| Plaintiff, Counter-Defendant | ) ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 08-38 |
| | ) | Administratively Consolidated with Adv. |
| | ) | Proc. No. 08-45. |
| VIRGINIA ELECTRIC POWER COMPANY, INC. | ) ) | |
| Defendant, Counter-Claimant. | ) ) | |
| | ) | |

## MEMORANDUM OPINION

Virginia Electric Power Company, Inc. ("DVP"), seeks entry of summary judgment on Counts I and III of the Amended Complaint filed against it by John Teitz, the Chapter 7 trustee of the bankruptcy estate of Buffalo Coal Co. (collectively, the "Debtor"). In Count I, the Debtor asserts a claim for breach of a coal supply agreement. DVP argues that the Debtor's only claim for damage under Count I is for lost profits, which is specifically excluded as an element of damage by the agreement, and, moreover, the Debtor's only remedy for DVP's alleged breach is to seek a contractual "termination payment" – the calculation of which would require the Debtor to pay DVP.

In Count III, the Debtor asserts a claim for a release of indebtedness due to DVP's alleged breach of a settlement agreement, monetary damages in excess of $75,000, and attorney's fees.

DVP seeks summary judgment on Count III on the basis that the claim is actually a defense to an action to enforce the settlement agreement and Count III does not seek affirmative relief.

For the reasons stated herein, the court will deny DVP's motion for summary judgment.

## I. STANDARD OF REVIEW

Summary judgment is appropriate when the matters presented to the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment has the initial burden of proving that there is no genuine issue as to any material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 161 (1970). Once the moving party has met this initial burden of proof, the non-moving party must set forth specific facts sufficient to raise a genuine issue for trial and may not rest on its pleadings or mere assertions of disputed facts to defeat the motion. *Matsushita Electric Industrial Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (stating that the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts"). The mere existence of a scintilla of evidence in support of the opposing party's position will not be sufficient to forestall summary judgment, but "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In ruling on a motion for summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. A fact is not "genuinely disputed" unless the factual conflict between the parties requires a trial of the case for resolution. *Finley v. Giacobbe*, 79 F.3d 1285, 1291 (2d Cir. 1996) ("If there is any evidence in the record from which a jury could draw a reasonable inference in favor of the non-moving party on a material fact, this Court will find summary judgment is improper.").

## II. BACKGROUND

Before February 2006, the Debtor operated several surface and deep coal mines in northeastern West Virginia. The Debtor's mines are in close proximity to DVP's Mount Storm power station, and the Debtor sold almost all of its coal to DVP pursuant to a series of coal supply agreements.

On January 1, 2002, DVP and the Debtor executed a coal supply agreement (the "First Supply Agreement"), which, according to the Debtor, obligated it to supply DVP with about 840,000

tons of coal per year from 2003-05. Problems arose between the Debtor and DVP regarding the First Supply Agreement, and on October 25, 2005, the parties executed a settlement agreement (the "Settlement Agreement") whereby DVP agreed to forego asserting its claim for $34.8 million in damages for the Debtor's breach of the First Supply Agreement so long as the Debtor performed under a new coal supply agreement executed by the parties on October 27, 2005 (the "Second Supply Agreement"). Under the Second Supply Agreement, the Debtor states that it was to supply DVP with about 1,000,000 tons of coal per year for a period of five years.

On February 22, 2006, DVP terminated the Second Supply Agreement on the grounds that the Debtor was insolvent and unable to pay its debts as they fell due. After receiving the termination notice, the Debtor ceased its business operations. The Debtor and DVP both accuse the other of breaching the Second Supply Agreement, and, by extension, the Settlement Agreement. The Second Supply Agreement is governed by Virginia law.

### III. DISCUSSION

In its motion for summary judgment, DVP contends that the Debtor's only remedy for DVP's alleged breach of the Second Supply Agreement is to seek a "termination payment." Even if that was not the Debtor's only remedy, DVP contends that the Debtor has not suffered any recoverable damage as a result of DVP alleged breach of the Second Supply Agreement; thus, the Debtor can state no claim for relief against it under a breach of contract theory. DVP also asserts that the Debtor's claim against it for breach of the Settlement Agreement fails to state any claim for affirmative relief; instead it merely provides a defense to any enforcement action that DVP may elect to undertake as a result of the Debtor's alleged breach of the Settlement Agreement.

**A.    "Termination Payment" as the Exclusive Remedy for Breach**

DVP asserts that, even if it is liable for breach of the Second Supply Agreement, the Debtor's remedy is to seek a contractual "termination payment." Considering that the termination payment is calculated the same whether DVP or the Debtor breached the Second Supply Agreement, DVP asserts that the Debtor would owe it money ($56,370,521), and, therefore, the Debtor has not suffered any damages capable of sustaining a cause of action for breach of contract.

Under § 9.2 of the Second Supply Agreement, a non-defaulting party "may, in its sole discretion, (i) accelerate and liquidate the Parties' respective obligations under this Agreement by establishing, and notifying the Defaulting Party of an Early Termination Date . . . ."

Section 9.2 is plainly permissive. Moreover, § 9.2(b) states that such right "shall be in addition to such Non-Defaulting Party's other rights under this Article 9." The "other rights" referred to in § 9.2(b) include § 9.4, which allows the Non-Defaulting Party to exercise any remedy available at law or in equity.[1] Consequently, the right to demand the Termination Payment (or, as DVP asserts, the Debtor's obligation to pay it) is not the Debtor's exclusive remedy for DVP's alleged breach of the Second Supply Agreement.

**B.   "Direct Actual Damages"**

An essential element of the Debtor's damage claim against DVP for breach of the Second Supply Agreement is a demand to recover what it believes are about $20 million in "lost profits," which, according to DVP, are specifically excluded by the Second Supply Agreement as a measure of compensation for breach of contract. The Debtor calculated its lost profits damage by determining the sale price of its coal to DVP had DVP performed under the Second Supply Agreement, and subtracting from that amount the costs it anticipated incurring to produce the coal.

Under § 9.3(d) of the Second Supply Agreement, the non-defaulting party's right to seek a "termination payment" is "without prejudice . . . to any right . . . to which any Party is at any time otherwise entitled (whether by operation of law, contract or otherwise)." Similarly, under § 9.4, when there exists a potential event of default[2] that is continuing, the non-defaulting party has the "right to . . . exercise any remedy available at law or in equity, provided that Section 9.7 [a limitation of liability provision] shall apply to and limit any such remedy." In the court's earlier memorandum opinion, it determined that the rights allowed under § 9.3(d) – like § 9.4(iii) – were subject to the

---

[1] In the court's earlier Memorandum Opinion, it stated that the right to seek a termination payment "is the sole and exclusive remedy according to the second sentence of Article 9.7." *Teitz v. Va. Elec. & Power Co. (In re Buffalo Coal Co.)*, No. 08-38, 2009 Bankr. LEXIS 3033 at *29-30 (Bankr. N.D.W. Va. Sept. 30, 2009). When referring to the "exclusive remedy," the court referenced § 9.7, which recites that when the Second Supply Agreement sets forth specific remedies, those remedies are the sole and exclusive remedies of the parties. The court was not limiting any right of a non-defaulting party that is expressly authorized by the Second Supply Agreement.

[2] A "Potential Event of Default" is defined as "an event which, with notice of passage of time or both, would constitute an Event of Default." (Second Supply Agreement § 1.1(w)).

-4-

limitation of liability provision in § 9.7,[3] which provides:

> THE PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS AGREEMENT SATISFY THE ESSENTIAL PURPOSE HEREOF . . . . ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED UNLESS OTHERWISE PROVIDED IN THIS AGREEMENT.  IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY HEREIN PROVIDED, THE LIABLE PARTIES' LIABILITY SHALL BE LIMITED TO **DIRECT ACTUAL DAMAGES** ONLY, SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY AND ALL OTHER REMEDIES AT LAW OR EQUITY SHALL BE WAIVED. . . . NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, **LOST PROFITS**, OR OTHER BUSINESS INTERRUPTION DAMAGES . . . .

(Second Supply Agreement, § 9.7) (emphasis added).

This limitation of liability provision expressly allows recovery for "direct actual damages" on one hand, but, on the other, excludes any remedy seeking "lost profits."  The Virginia Commercial Code and Virginia common law are both important to determining what constitutes a "direct actual damage" for a buyer's breach of contact (and thus recoverable under § 9.7 of the Second Supply Agreement), and for determining what is meant in § 9.7's limitation of liability provision when it states that "lost profits" are specifically excluded as a recoverable measure of damage.[4]

Pursuant to the Virginia Commercial Code, when a buyer repudiates a contract, the aggrieved seller may "recover damages for nonacceptance (§ 8.2-708) . . . ."  Under § 8.2-708(1), the measure

---

[3] *Teitz v. Va. Elec. & Power Co. (In re Buffalo Coal Co.)*, No. 08-38, 2009 Bankr. LEXIS 3033 (Bankr. N.D.W. Va. Sept. 30, 2009).

[4] Under Virginia's Uniform Commercial Code, "[a] contract for the sale of minerals . . . to be removed from realty is a contract for the sale of goods within this title if they are to be severed by the seller but until severance a purported present sale thereof which is not effective as a transfer of an interest in land is effective only as a contract to sell."  Va. Code § 8.2-107(1).  Accordingly, to the extent that the Debtor had severed coal from its property, Virginia's Uniform Commercial Code determines what remedies are available to the Debtor for DVP's alleged breach; to the extent that DVP purchased coal that remained in the ground, the Second Supply Agreement is a contract to sell and remedies for its breach are analyzed under Virginia common law.

–5–

of damages "is the difference between the market price at the time and place for tender and the unpaid contract price . . . ." But, if that measure of damages is not adequate to put the seller in as good a position as performance would have, "then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer . . . ." § 8.2-708(2). The above-stated remedies provided in § 8.2-708 are actual, direct damages owed to a seller of goods. *E.g*, *Langham-Hill Petroleum, Inc. v. Southern Fuels Co.*, 813 F.2d 1327, 1329 (4th Cir. 1987) (noting that the district court "found the measure of damages under U.C.C. § 2-708(1) to be the difference between the market price at the time and place of expected tender and the unpaid contract price. This formula yields $306,075.00 in actual damages."); *Coast Trading Co. v. Cudahy Co.*, 592 F.2d 1074, 1082 (9th Cir. 1979) (reciting that § 2-708 is concerned with the damages the seller actually suffered as a direct result of the loss of sale to the buyer); *Hi-Tec Plastics v. AMI, Inc.*, 886 F. Supp. 774, 776 (D. Colo. 1995) (noting that a claim for lost profits against a breaching buyer is a claim for damages that was incurred as a direct result of the alleged breach).

Similarly, under Virginia common law, "the remedy for breach of contract is intended to put the injured party in the same position in which it would have been had the contract been performed." *Hess Energy, Inc. v. Lightning Oil Co.*, 338 F.3d 357, 362 (4th Cir. 2003). Direct damages are generally understood to be "those which arise 'naturally' or 'ordinarily' from a breach of contract; they are damages which, in the ordinary course of human experience, can be expected to result from a breach." *Blue Stone Land Co. v. Neff*, 526 S.E.2d 517, 519 (Va. 2000). One measure of direct damages under Virginia law is to determine the seller's lost profit. *E.g.*, *A. I. M. Percolating Corp. v. Ferrodine Chemical Corp.*, 124 S.E. 442, 446 (Va. 1924) (allowing lost profits as the measure of actual damages when the buyer repudiated its obligation to buy the seller's acid iron mineral water); *see also Energy Capital Corp. v. United States*, 302 F.3d 1314, 1328-29 (Fed. Cir. 2002) ("Energy Capital's anticipated profits flowed directly from the [breached contract] not from 'other independent and collateral undertakings'"; thus, are recoverable as direct, actual damages); *Moore v. Boating Indus. Assocs.*, 754 F.2d 698, 717 (7th Cir.) ("Lost profits are considered to be general or direct damages in a breach of contract case . . . ."), *vacated on other grounds and remanded*, 474 U.S. 895 (1985).

Of course, a seller's loss of profit related directly to the non-performance of the primary contract is but one form of lost profit. Another type of lost profit occurs when the defendant's

-6-

breach of a sale contract causes the plaintiff to lose profit on third party, unrelated contracts. As explained by the Court of Appeals for the Second Circuit:

> Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements. In the typical case, the ability of the non-breaching party to operate his business, and thereby generate profits on collateral transactions, is contingent on the performance of the primary contract. When the breaching party does not perform, the non-breaching party's business is in some way hindered, and the profits from potential collateral exchanges are "lost." . . .
>
> By contrast, when the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are general damages. The damages may still be characterized as lost profits since, had the contract been performed, the non-breaching party would have profited to the extent that his cost of performance was less than the total value of the breaching party's promised payments. But, in this case, the lost profits are the direct and probable consequence of the breach. The profits are precisely what the non-breaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed.

*Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89, 109 (2d Cir. 2007).

Accordingly, a damage claim for "lost profit" has multiple meanings; it could mean a seller's lost profit on breach of the primary contract, or it could mean that the non-breaching party has lost profit on secondary contracts with third parties as a result of the breach of the primary contract. With this understanding that "lost profits" can refer to different measures of damage, the next step in this case is to determine the meaning of the term "lost profit" as it is used in the Second Supply Agreement's limitation of liability provision.

In construing and interpreting Second Supply Agreement, the court must ascertain and effectuate the parties's lawful intention by placing itself "in the position of the parties when the contract was made" and by considering the "purposes, the subject matter, and the circumstances under which their minds met." *Jackson v. North America Assurance Soc.*, 183 S.E.2d 160, 161 (Va. 1971). The Second Supply Agreement is to "be construed as a whole, and effect given to every provision thereof if possible." *Ames v. American Nat'l Bank*, 176 S.E. 204, 216 (Va. 1934). In this regard, "[n]o word or paragraph can be omitted in construing the contract if it can be retained and a sensible construction given to the contract as a whole." *Id.*

–7–

Here, the Second Supply Agreement plainly contemplates that the non-breaching party may recover "direct actual damages," and plainly contemplates that "lost profits" are to be excluded as an element of recovery. As noted above, the term "lost profits" can have meaning both as an element of a party's direct, actual damage incurred as a result of breach, and as an element of a party's consequential damages incurred as a result of breach. To give effect to both the allowance and disallowance language of § 9.7, the exclusion of "lost profits" as an element of damage must necessarily relate to that term's meaning as an element of consequential damage – not direct damage. Moreover, the term "lost profits" is listed in the same string of excluded damages as "consequential, incidental, punitive, exemplary or indirect damage . . . or other business interruption damages." In context, the exclusion of "lost profits" serves the similar purpose as the other exclusions – limiting a party's right to recover indirect damages. *See, e.g.*, *Penncro Assocs. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1162 (10th Cir. 2007) ("We hold that, in keeping with plain meaning and legal norms, where parties to an agreement exclude liability only for consequential damages, profits lost as a direct result of a breach may be recovered.").

Therefore, concluding that § 9.7 of the Second Supply Agreement does not exclude lost profits as an element of a party's direct actual damage as a result of breach, and considering that the Debtor has asserted about $20 million in lost profit damages, no grounds exist to grant DVP's motion for summary judgment with regard to Count I of the Debtor's adversary complaint.

**C.     Breach of the Settlement Agreement**

In Count III of the Amended Complaint, the Debtor states that the Settlement Agreement is a contract, it performed all the conditions precedent to enforcement of the Settlement Agreement, DVP breached the Settlement Agreement, and, consequently, the Debtor suffered damages, including the non-elimination of indebtedness. The Debtor requests damages exceeding $75,000, plus costs, attorney's fees, interest, and for such additional relief as the court may deem appropriate.

DVP asserts that Count III is not a claim for breach of contract; rather, it is a claim for release of indebtedness. Release is an affirmative defense and not a cause of action. *E.g.*, *Overseas Private Investment Corp. v. Industria de Pesca, N.A., Inc.*, 920 F. Supp. 207, 209 (D.D.C. 1996) ("While release may be pleaded as an affirmative defense, there is no independent cause of action for 'release'"). Additionally, under § 8.5 of the Settlement Agreement, each party "agrees that it

–8–

shall bear its own costs and expenses with respect to the negotiation, preparation, execution, and performance under the Settlement Documents and the settlement evidenced thereby." Finally, DVP asserts that the Debtor has not pled the declaratory judgment act of 28 U.S.C. § 2201 as a basis for stating a claim for release.

While part of the Debtor's claim seeks release of indebtedness, the Debtor is also seeking affirmative relief for damages exceeding $75,000. The Settlement Agreement does not specifically prohibit the shifting of expenses, fees, or costs with regard to enforcement actions. Should the Debtor ultimately succeed, the court has yet to determine if any basis exists for departing from the American Rule on the payment of attorney's fees. Consequently, the court will deny DVP's motion for summary judgment with regard to Count III of the Debtor's Amended Complaint.

## IV. CONCLUSION

For the above-stated reasons, the court will enter a separate order pursuant to Fed. R. Bankr. P. 7058 that denies DVP's motion for summary judgment as to Counts I and III of the Debtor's Amended Adversary Complaint.