Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge
Dated: Monday, August 16, 2010 3:23:08 PM

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BUFFALO COAL CO., | ) | Case No. 06-366 |
| | ) | |
| Debtor. | ) | Chapter 7 |
| _____ | ) | |
| | ) | |
| JOHN W. ("JACK") TEITZ, trustee of the estate of BUFFALO COAL CO., | ) ) | |
| | ) | |
| Plaintiff, Counter-Defendant | ) ) | |
| | ) | |
| v. | ) ) ) | Adv. Proc. No. 08-38 Administratively Consolidated with Adv. Proc. Nos. 08-41 and 08-45. |
| VIRGINIA ELECTRIC POWER COMPANY, INC. | ) ) | |
| Defendant, Counter-Claimant. | ) ) | |
| _____ | ) | |

## MEMORANDUM OPINION

This adversary proceeding is before the court on the amended complaint of John W. Teitz (the "Trustee"), the Chapter 7 trustee for the estate of Buffalo Coal Company, for breach of a coal supply agreement that Buffalo Coal executed with Virginia Electric Power Company, Inc. ("DVP").[1]

---

[1] Trial to the court was held on March 1, 2, 3, 4, 5, 8, 9, and 10, 2010. The court heard from 16 live witnesses, and the deposition testimony of 24 more witnesses (plus testimony from the meeting of creditors) were submitted post-trial. The parties submitted post-trial briefing, and on June 9, 2010 the parties submitted their joint deposition designation exhibit list, at which time the case was ripe for decision. In reaching its decision, the court has not relied upon any excerpts from the deposition designations to which either party objected, nor has it relied on any

The Trustee asserts that DVP breached the agreement when it issued a February 26, 2006 termination letter based on Buffalo Coal's insolvency and inability to pay debts when due.[2] The Trustee claims that DVP waived, or was estopped from raising, Buffalo Coal's insolvency as a grounds for terminating the agreement.

For the reasons stated herein, the court will deny the relief sought by the Trustee in his amended complaint.[3]

## I. BACKGROUND

In 2001, and 2002, Buffalo Coal was a profitable company. In 2003, its operations broke even. In 2004, Buffalo Coal began to lose money, and those losses continued through February 2006. A major reason why Buffalo Coal was losing money in 2004 and 2005 was that it had a relatively fixed-price coal supply agreement with DVP, executed in 2002, which was to last into 2006 (the "First Supply Agreement"). The contract called for 840,000 tons of coal to be delivered each year to DVP. By 2005, the contract price for each ton of coal was about $6 less than the amount it cost to produce it.

About 90% of Buffalo Coal's total production went to DVP either directly under the First Supply Agreement, or indirectly under a separate supply agreement executed between Buffalo Coal and PBS Coal. Like its direct supply agreement with DVP, Buffalo Coal was also losing money on each ton shipped to PBS Coal.

Recognizing that its operations were not financially sustainable, in the spring and summer of 2005, Buffalo Coal sought to restructure its coal supply contracts in a manner that would allow it to make a profit. Wanting to maintain Buffalo Coal as a reliable, low-cost supplier to it, DVP agreed to work with Buffalo Coal in an effort to improve its financial condition. For example, on May 11, 2005, DVP agreed to temporarily increase the price it paid Buffalo Coal by about $20 per

---

of the disputed deposition exhibits.

[2] DVP's termination letter lists both insolvency and inability to pay debts when due as a basis for termination. For simplicity, the court will refer to both events as insolvency.

[3] The Trustee also objects to DVP's proofs of claim in this case. The court will enter a separate order adjudicating that objection and DVP's counterclaim against Buffalo Coal's bankruptcy estate for breach of contract.

-2-

ton and to make a prepayment of $1.5 million on future coal shipments. In June 2005, DVP agreed to suspend recoupment on a $567,000 overpayment it made to Buffalo Coal.

To assist it in negotiating the new contract with DVP and to obtain financing, Buffalo Coal hired a financial consultant, George Brikis. Brikis prepared a business plan for Buffalo Coal, which, he stated, when combined with a new supply contract, would enable Buffalo Coal to obtain bank financing for its operations.

On June 16, 2005, the two principals of Buffalo Coal, Gerald Ramsburg and Chuck Howdershelt, and Brikis met with DVP to discuss the execution of a new coal supply contract. Ramsburg testified that Rick Coles, the head of DVP's fuel's group, led him to believe that DVP would assist in Buffalo Coal's transition through its difficult financial situation to allow it to begin production under a new contract. During the meeting an employee of DVP's fuels group mentioned that Buffalo Coal may want to consider filing bankruptcy. At the time, however, neither Ramsburg nor Howdershelt had any intention to file bankruptcy, based, in part, on the fact that they had exposure on Buffalo Coal's debts through guarantee agreements and they had responsibilities to the numerous companies with whom Buffalo Coal did business. Ramsburg and Howdershelt said that bankruptcy was not an option and should not be considered.

Following the June 16, 2005 meeting, DVP asked the accounting firm of KPMG to investigate Buffalo Coal's books and records to determine its costs of production, and it hired a mining expert, Paul Goad of Norwest Corporation, to review Buffalo Coal's mining operations. Both recommended that DVP increase the price it paid for Buffalo Coal's production. Mr. Goad opined that Buffalo Coal had sufficient reserves to fulfill a supply contract and adequate equipment to reach production goals. Through DVP's investigation of Buffalo Coal's finances and operations, DVP learned that Buffalo Coal was having difficulty paying its debts as they became due.

Based on the results of the KPMG and Goad investigations, DVP determined that it was in its best interest to move forward with a new coal supply agreement with Buffalo Coal. DVP also determined that it would assist Buffalo Coal in eliminating its exposure under its supply contract with PBS Coal. In DVP's estimation, Buffalo Coal's potential exposure under the PBS Coal contract was about $50 million, and its exposure under the First Supply Agreement was about $38 million.

On July 8, 2005, Buffalo Coal and DVP executed a letter agreement, which was to be a

bridge in reaching a new coal supply agreement. Under the letter agreement, DVP agreed to increase the price it paid per ton of coal by about $11.

To reach an agreement on the essential terms of the new supply contract, DVP and Buffalo Coal's principals met on August 5, 2005. Coles, however, was no longer the head of DVP fuels group, having been replaced by Karla Haslip. At the August 5th meeting, the parties reached a "handshake" agreement whereby DVP agreed to increase the amount it paid for each ton of coal delivered, agreed to numerous price escalators, and agreed to a 5-year contract for 1 million tons of coal per year.

Both parties believed that the final, written version of the handshake agreement would be a "bankable document" that Buffalo Coal could use to obtain financing to resolve Buffalo Coal's liquidity problems. Based on comments from Brikis, DVP believed that Buffalo Coal had banks lined-up, waiting to provide financing once the contract was finalized.[4] As Tracy McClung, manager of fuels contracts at DVP, testified, DVP did not anticipate that Buffalo Coal would be filing bankruptcy after execution of the new supply contract because it anticipated that the new contract would help Buffalo Coal with its cash flow issues and make it a viable coal supplier. (McClung Depo. 122).

To meet its production requirements under the new supply contract, Buffalo Coal and DVP knew that it was essential that Buffalo Coal obtain the necessary permits to begin surface mining at its C-1 North site. The permit for this site was delayed because C-1 North contains wetlands and mining would affect the habitat of a certain species of squirrel and bat. Knowing the importance of obtaining the permit, DVP had its public relations department attempt to facilitate its issuance.

On October 27, 2005, Buffalo Coal and DVP executed the final version of the new coal supply agreement (the "Second Supply Agreement"). At the same time, Buffalo Coal executed a settlement agreement of its obligations under the First Supply Agreement, whereby amounts owed

---

[4] For example, Edward Roarty, director of commercial fuels for DVP, stated, "Buffalo had represented continuously with their boy, Mr. Brikis, that this executed agreement would be [a] 'bankable document.' That once they executed they would be able to get such a credit line that all the debts would be paid . . . instantaneously . . . . Mr. Brikis took his position as a previous officer in various banks. He said he had banks lined up, that he had a revolving line of credit and given them an umbrella credit agreement and that would all be done upon execution of this document." (Roarty Depo. 161.)

to DVP would be forgiven based on Buffalo Coal's future performance under the Second Supply Agreement.[5]

By early November 2005, Buffalo Coal had not obtained any bank financing. Brikis testified that he could not obtain the funding because banks wanted to see several months of production before making a loan to ensure that Buffalo Coal could meet its contractual obligations. Buffalo Coal did not have that history. In need of money, Buffalo Coal asked DVP for a $2.2 million advance on delivered tons under the Second Supply Agreement. Edward Roarty, director of commercial fuels at DVP, strongly told Buffalo Coal "no," and stated he was offended at Buffalo Coal's audacity in asking for an advance so soon after execution of the Second Supply Agreement, especially considering Buffalo Coal's earlier representation that it would have bank financing immediately or soon after its execution. (Roarty Depo. 170-71). DVP did, however, accelerate payments on delivered coal so that Buffalo Coal would be paid by electronic transfer almost immediately.

From November 2005 through mid-February 2006, DVP was having on-going concerns over Buffalo Coal's performance, and, consequently, concerns about its financial condition. DVP attempted to institute a weekly telephone conference with Howderselt and Ramsburg regarding production, but they were difficult to contact. In an internal email dated December 16, 2005, DVP was contemplating calling other Buffalo Coal vendors to file an involuntary bankruptcy against it.

---

[5] Performance of Second Supply Agreement was not to begin until the "contract commencement date," which was defined as 30 days after Buffalo Coal obtained the necessary permit to begin mining C-1 North, or March 1, 2006, whichever was earlier. On November 21, 2005, the United States Army Corps of Engineers issued Buffalo Coal the necessary "404 permit" to allow mining operations to begin at its C-1 North strip mine. Both Buffalo Coal's principals and DVP believed that the Second Supply Agreement's contract commencement date began 30 days from November 21st. However, drainage ponds at C-1 North had to be approved by the West Virginia Department of Environmental Protection before full-scale mining could begin. A state inspector examined "Pond B" on December 8, 2005, and noted certain deficiencies – the rock "riprap" at the entrance and exit channels was insufficient. Pond B was finally certified by the Department of Environmental Protection on January 17, 2006. Before that time, Buffalo Coal was entitled to mine the coal necessary for the excavation of the drainage ponds. Whether the "contract commencement date" for the Second Supply Agreement was 30 days from November 21, 2005, or 30 days from January 17, 2006, is not material to the court's holding in this case.

In fact, Buffalo Coal was running into increasing problems with its secured lenders and trade creditors. On February 1, 2006, the operational chips on the Debtor's Kamatsu equipment – required to effectively mine C-1 North – were disabled for nonpayment. Kamatsu demanded $1.1 million to reenable the equipment. The CDS Family Trust, which leased property to Buffalo Coal and had a blanket lien on nearly all Buffalo Coal's property, had filed a state court complaint for non-payment of $122,000 in rent. Guteman Oil, the fuel vendor, had been unpaid and was owed about $500,000.

Although Buffalo Coal had orally promised DVP production deliveries of 60,000 tons in December 2005, and 90,000 tons in January 2006, it was only able to deliver less than 40,000 tons each month. For the first two weeks in February 2006, Buffalo only delivered 7,800 tons to DVP. As Jeffery Miscikowski, director of fuel operations for DVP, testified, DVP had a general frustration with Buffalo Coal – it kept telling DVP one thing, and another thing happened. (Miscikowski Depo. 217, 224-25). For example, by February 2006, Buffalo Coal still had not obtained bank financing and was negotiating for equipment refinancing with small, non-banking, independent companies. On February 14, 2006, Miscikowski sent an internal email that advocated convincing Buffalo Coal to implement a "structured bankruptcy," and having another employee, Ben Baughn, speak to Ramsburg and Howdershelt about the possibility. Based on subsequent events, however, Baughn was instructed not to speak about the topic. Roarty testified that Miscikowski's email never got "any traction" at DVP. (Roarty Depo. 208).

Also on February 14, 2006, Ramsburg, Howdershelt, and Haslip conducted a telephone conference where Ramsburg believed that he heard Haslip mention something about how Buffalo Coal should consider bankruptcy, and if it filed, there may be some things that DVP could do to help.[6] Haslip denies ever suggesting to Buffalo Coal that it file bankruptcy. Nevertheless, following the February 14th conference call, Ramsburg requested that Brikis go to DVP's offices in Richmond Virginia to, in his view, discover what DVP meant when it allegedly suggested a bankruptcy filing.

Initially, Haslip refused to meet with Brikis because DVP was not aware of what Brikis wanted to talk about and it was "unusual" for Haslip to have a meeting with Buffalo Coal without

---

[6] As discussed *infra*, the court finds that Haslip never mentioned bankruptcy during the February 14, 2006 telephone call.

-6-

its principals being present. On being informed by Buffalo Coal's principals that the meeting was "very important," Haslip agreed to meet Brikis on February 16, 2006.

At the February 16th meeting, Brikis discussed a potential bankruptcy filing by Buffalo Coal and outlined what such a proceeding would look like for both Buffalo Coal and DVP. The meeting lasted, based on varying accounts between two and three hours. Brikis stated that Haslip was attentive, she asked some questions, but she was non-committal. At the end of the meeting, Haslip asked Mr. Brikis to summarize what he had spoken about in writing.

Brikis memorialized his summary in a February 20, 2006 email; the subject line states: "Outline of Potential ReOrg Plan needs/Vepco Role." His email was approved by Howdershelt before it was sent, and in Brikis's words, it was meant to convey a sense of urgency. The letter was copied to Buffalo Coal's bankruptcy counsel. Among other things, the email states that Buffalo Coal intended to file a Chapter 11 bankruptcy, renegotiate the Second Supply Agreement in an attempt to obtain about a $10 per ton price increase, have DVP serve as Buffalo Coal's debtor-in-possession lender for a $6.5 million loan, and the email indicated that Buffalo Coal would go to competitors unless DVP agreed to its proposals. Time was stated to be "of the essence" in that Buffalo Coal only had a few weeks to identify a bankruptcy lender.

Brikis's email was not well received by DVP. As stated by David Holden, DVP's vice president of enterprise risk management, the Brikis email was the "straw that broke the camel's back":

> We had been working with Buffalo for, at that point, almost a year. We had prepaid for tons. We had renegotiated the contract. We had entered into a second level agreement to provide a bridge between the initial communication and our negotiation of the Dominion contract executed in October. All of these things to ensure that Buffalo had everything it needed to operate comfortably and profitably right afer execution of this agreement in October 2005.
> On February 20th . . . we get a letter or email of Buffalo's intent to file bankruptcy. At that point we have done all we believe humanly possible to support Buffalo and my opinion was we have no obligation to do anything further.
> . . . .
> I can tell you my recommendation [to terminate the Second Supply Agreement] was based on the Brikis email which is the straw that broke the camel's back as well as all the activities that had taken place from the beginning of 2005 until February 2006.

(Holden Depo. 126-29.)

On February 22, 2006, DVP terminated the Second Supply Agreement based on an express event of default that gave DVP termination rights should Buffalo Coal become insolvent or unable to pay its debts as they became due. On advice of its counsel, Buffalo Coal later ceased all its operations. DVP then made a demand on Buffalo Coal to pay damages under the Second Supply Agreement, which it estimated to be about $56 million, and damages for breach of the Settlement Agreement, which it estimated to be about $32 million.

## II. DISCUSSION

In the court's September 30, 2009 memorandum opinion on summary judgment, it found that genuine issues of material fact existed regarding whether DVP impliedly waived its right to terminate the Second Supply Agreement based on Buffalo Coal's insolvency, or whether DVP was estopped from asserting damages against Buffalo Coal. Both the Trustee's waiver and estoppel theories are based on DVP's course of conduct in executing and terminating the Second Supply Agreement.

The Trustee does not contend that DVP expressly waived any provision of the Second Supply Agreement. The Trustee's implied waiver theory is based on the premise that, at all relevant times, DVP knew that Buffalo Coal was an insolvent company. In the Trustee's view, DVP could not execute the Second Supply Agreement in good faith when DVP had the right to terminate that Agreement at the very moment it was signed. Similarly, the Trustee asserts that DVP is estopped from relying on Buffalo Coal's insolvency to terminate the Second Supply Agreement when DVP knew Buffalo Coal was insolvent when the Agreement was executed, and when DVP encouraged Buffalo Coal to expend money to perform under the Agreement. Moreover, in the Trustee's view, DVP encouraged Buffalo Coal to file bankruptcy, and when Buffalo Coal decided to follow that advice, DVP terminated the Agreement on that basis.

The parties agree that Virginia law is applicable to this case. Under Virginia law, waiver excuses the enforcement of an otherwise valid contractual right. "'Waiver is the voluntary, intentional abandonment of a known legal right, advantage, or privilege.'" *Weidman v. Babcock*, 400 S.E.2d 164, 167 (Va. 1991) (quoting *Fox v. Deese*, 362 S.E.2d 699, 707 (Va. 1987)). The elements of waiver are: "knowledge of the facts basic to the exercise of the right and the intent to relinquish that right." *Id.* "[W]aiver must be express, or, if it is to be implied, [the intention to waive a right] must be established by clear and convincing evidence." *Baumann v. Capozio*, 611

−8−

S.E.2d 597, 600 (Va. 2005). "'Voluntary choice is of the essence of waiver.'" *May v. Martin*, 137 S.E.2d 860, 865 (Va. 1964) (citation omitted). Waiver is to be distinguished from passive acquiescence; "an obligee's acceptance of less than full performance by the obligor does not prove intent to relinquish the right to enforce full performance." *Stanley's Cafeteria, Inc. v. Abramson*, 306 S.E.2d 870, 873 (Va. 1983).

For DVP to be equitably estopped from terminating the Second Supply Agreement the Trustee must show the following elements "by clear, precise, and unequivocal evidence":

> (1) A material fact was falsely represented or concealed; (2) The representation or concealment was made with knowledge of the facts; (3) The party to whom the representation was made was ignorant of the truth of the matter; (4) The representation was made with the intention that the other party should act upon it; (5) The other party was induced to act upon it; and (6) The party claiming estoppel was misled to his injury.

*Moorman v. Blackstock, Inc.*, 661 S.E.2d 404, 411 (Va. 2008).

Here, the Trustee relies on the following primary factual assertions to demonstrate – by clear and convincing evidence – that DVP impliedly waived its right under the Second Supply Agreement to declare Buffalo Coal in default based on its insolvency. Similarly, the Trustee argues that his factual assertions show clear, precise, and unequivocal evidence that DVP is estopped from raising Buffalo Coal's insolvency as an event of default under the Second Supply Agreement:

- Haslip testified that DVP had the right to terminate the Second Supply Agreement on the date it was signed based on Buffalo Coal's insolvency, but elected not to terminate it on that date.

- DVP encouraged and induced Buffalo Coal to expend resources in preparing the C-1 North mine for production after execution of the Second Supply Agreement.

- From the summer of 2005 to the date of contract termination on February 22, 2006, DVP was fully aware of Buffalo Coal's financial condition – that it was insolvent and having difficulty paying its debts as they became due.

- In October 2005, shortly before execution of the Second Supply Agreement, DVP noted that Buffalo Coal was close to bankruptcy.

- DVP called Komatsu, one of Buffalo Coal's equipment vendors, to assure Komatsu that Buffalo Coal and DVP had entered into a new contract that provided Buffalo

–9–

Coal with a higher price per ton.

- In November 2005, after execution of the Second Supply Agreement, DVP noted that Buffalo Coal was still close to bankruptcy and was struggling both operationally and financially, and on November 17, 2005, DVP internally circulated a memo that included planning assumptions for a Buffalo Coal bankruptcy.

- In late November 2005, DVP, as a coal supply consultant to Mount Storm Coal Supply, LLC, arranged for the execution of a coal supply agreement between Buffalo Coal and Mount Storm Coal Supply.

- On December 19, 2005, DVP internally discussed whether to speak with Buffalo Coal's vendors to force Buffalo Coal into bankruptcy.

- On January 24, 2006, a DVP employee noted that Buffalo Coal was still struggling with cash flow, yet, DVP still did not terminate the Second Supply Agreement based on Buffalo Coal's insolvency or inability to pay debts when due.

- In June 2005, and again on February 14, 2006, DVP employees suggested to Buffalo Coal's principals that they might consider filing a bankruptcy on behalf of Buffalo Coal. More specifically, in the February 14, 2006 conference call between Gerald Ramsburg and Karla Haslip, Ramsburg believed that he understood Haslip to suggest that Buffalo Coal should consider filing bankruptcy, and if it did, there were certain things that DVP could do to help.

- In a February 14, 2006 DVP email an employee of DVP's fuels group stated that he favored convincing Buffalo Coal to implement a "structured bankruptcy" over declaring the Second Supply Agreement in default.

After considering all the facts of this case, however, the court does not believe that the Trustee has demonstrated clear and convincing evidence that DVP impliedly waived its right to terminate the Second Supply Agreement based on Buffalo Coal's insolvency. Likewise, the court does not believe that the Trustee has met his burden of showing clear, precise, and unequivocal evidence that DVP is estopped from raising insolvency as an event of default.

Importantly, Buffalo Coal told DVP employees on June 16, 2005, that it did not intend to file bankruptcy. Likewise, at the time of the execution of the Second Supply Agreement on October 27, 2005, neither Buffalo Coal nor DVP contemplated that the Debtor would have any need for a

-10-

bankruptcy filing.

Although DVP was aware, at all relevant times, that Buffalo Coal was struggling to pay its debts when due, it attempted to help Buffalo Coal become a solvent company before the execution of the Second Supply Agreement by: increasing the amount it paid for coal on May 11, 2005 by about $20 per ton, making a $1.5 million pre-payment on coal in May 2005, suspending recoupment efforts on a $567,000 overpayment, entering into a letter agreement to serve as a bridge to the execution of the Second Supply Agreement, and by obtaining a release from PBS Coal of Buffalo Coal's obligations to it – which, according to DVP, eliminated a $50 million liability.

The execution of the Second Supply Agreement – which was far more favorable to Buffalo Coal than the First Supply Agreement – was intended to enable Buffalo Coal to obtain bank financing to alleviate its liquidity difficulties, and enable Buffalo Coal to pay its vendors. The Second Supply Agreement, which contained a higher price per ton of coal and favorable cost escalator provisions, was, in the view of both parties, a "bankable document." As both Haslip and Ramsburg testified, both parties intended to fully perform the Second Supply Agreement and believed that its execution would rehabilitate Buffalo Coal such that it could be a reliable, dependable supplier of coal to DVP.

After the execution of the Second Supply Agreement, DVP continued to assist Buffalo Coal by facilitating the issuance of the C-1North mining permit, enacting favorable payment terms for coal actually delivered to it, and by speaking with Buffalo Coal's vendors to confirm that DVP had executed a new, long-term supply agreement with Buffalo Coal. When the Army Corps of Engineers issued the "404 permit" on November 21, 2010, granting permission to Buffalo Coal to begin strip mining at C-1 North, DVP regarded that as a very positive development.

Unfortunately, from December 2005 through February 16, 2006, events occurred that dramatically changed the relationship between DVP and Buffalo Coal. DVP came to believe that Buffalo Coal would not be able to obtain financing from a bank or other source despite Brikis's representation that such bank financing would be immediately forthcoming after execution of the Second Supply Agreement. DVP denied a request for a $2.2 million advance in November 2005, and by February 2006, Buffalo Coal had not obtained any bank financing and was still trying to negotiate lending from non-banking entities. Buffalo Coal told DVP that it was mining the C-1 North permit area in December 2005 and to expect 60,000 tons in December and 90,000 tons in

-11-

January. Yet, Buffalo Coal could not legally begin mining C-1 North until January 17, 2006 (other than removing coal necessary to build ponds and drainage structures), and failed to meet its orally promised coal deliveries for December and January. Less than 40,000 tons were delivered each month, and DVP regarded the deliveries from early to mid-February 2006 as insignificant. DVP was aware that Buffalo Coal was on a cash basis with many of its creditors and that in early February 2006, Buffalo Coal's Kamatsu mining equipment was disabled for non-payment. Without the equipment, Buffalo Coal would not be able to meet its production quotas under the Second Supply Agreement.

Although numerous internal documents of DVP address and even advocate for a possible Buffalo Coal bankruptcy filing, those types of documents and discussions are normal and to be expected in the ordinary course of DVP's business; if for no other reason than prudent contingency planning as offered by several DVP witnesses. DVP was dealing with a financially distressed company that was attempting to turn its business around using the Second Supply Agreement as the foundation.

While the Trustee presented evidence that Haslip told Ramsburg and Howdershelt on February 14, 2006 that Buffalo Coal should consider bankruptcy, and if it did, there were certain things DVP could do to help, and following the meeting Ramsburg sent Brikis to DVP's offices to discuss that possibility, Haslip denied ever making that statement and initially refused to meet with Brikis because she had no idea what the meeting would be about. Buffalo Coal was very secretive about why Brikis was coming to DVP, stating only that the meeting was "very important." Although internal DVP documents exist discussing (and even advocating) the possibility of a Buffalo Coal bankruptcy filing, those documents were discussion points that never got "any traction," and if such a decision were to be made, it would have been done with input and the concurrence of credit risk management and legal affairs.[7] Moreover, when Brikis went to DVP's offices, he did not go to listen to what DVP was allegedly contemplating concerning a Buffalo Coal bankruptcy – he went to inform DVP regarding what would happen in a Buffalo Coal bankruptcy. Brikis did the talking,

---

[7] David Holden, who oversees DVP's credit risk management team, testified that he did not discuss a bankruptcy option for Buffalo Coal with the fuels group after June 2005. (Holden Depo. 122, 175).

-12-

and in his words, Haslip was attentive, but non-committal. In fact, the evidence shows that Buffalo Coal was contemplating a bankruptcy filing in advance of the February 16, 2006 meeting, having previously met with bankruptcy counsel for several hours. In short, the Trustee failed to demonstrate that Haslip made the alleged statements advocating a bankruptcy filing by Buffalo Coal.

Additionally, as Haslip testified, DVP had no intention of invoking Buffalo Coal's insolvency as an event of default at the time the Second Supply Agreement was executed, or thereafter. In her view, to do so would be an act of bad faith. Both parties knew of Buffalo Coal's financial distress, but the execution of the Second Supply Agreement (like the release of nearly $88 million in potential contract exposure from the First Supply Agreement and the PBS Coal contract) was meant to be a stepping stone in Buffalo Coal's return to financial health and adequate time had to be allowed for Buffalo Coal to embark on that recovery. Unfortunately, Buffalo Coal was unable to convince DVP in November, December, January, or February of 2005-06 that it could effect that recovery. Rather than improving its financial condition, its finances and operations deteriorated.[8]

Accordingly, Brikis's February 16, 2006 meeting with Haslip marked a dramatic departure from Brikis's business plan and the facts, circumstances, and intentions underlying the execution of the Second Supply Agreement. DVP, who in Ramsburg's view, had gone out of its way to help Buffalo Coal, was now faced with a threatened, deleterious renegotiation of the Second Supply Agreement that it had executed a mere four months earlier, and which had been the product of several months of due diligence and negotiation. The Second Supply Agreement was executed, in part, to prevent Buffalo Coal from entering bankruptcy. At the execution of the Second Supply Agreement, Buffalo Coal had leases, equipment, manpower, and experience. By February 2006, members of Buffalo Coal's management had resigned,[9] the CDS Trust had terminated Buffalo Coal's mining leases, and Buffalo Coal's mining equipment was disabled by Kamatsu for non-payment. The financing that was on the verge of occurring at the end of October 2005 had not materialized. Buffalo Coal, who had asked for $2.2 million in November 2005, was now demanding

---

[8] In February 2006, even Buffalo Coal's porta john vendor removed the bathroom facilities for non-payment.

[9] For example, Dick Bolen, a coal industry veteran hired by Buffalo Coal in the summer of 2005, resigned as of February 21, 2006.

-13-

$6.5 million in financing from DVP to satisfy critical liquidity issues. According to the Brikis email, time was of the essence and Buffalo Coal only had a few weeks left to identify a bankruptcy lender to provide it with a credit facility in order for it to stay in business.

Specifically, the court does not believe that the Trustee proved waiver in this case because the parties' relationship and expectations as of February 22, 2006, were far different than their relationship and expectations at the time the Second Supply Agreement was executed on October 27, 2005. The financial turn-around of Buffalo Coal's business that the parties anticipated following the execution of the Second Supply Agreement had not materialized. Buffalo Coal did not obtain the promised bank financing. Its financial condition continued to deteriorate. Production levels had not improved. DVP could not rely on the oral production promises of Ramsburg and Howdershelt. Buffalo Coal was threatening DVP with a renegotiation of the Second Supply Agreement in bankruptcy court, and Buffalo Coal communicated to DVP that time was of the essence in identifying a bankruptcy lender due to its distressed financial condition. Buffalo Coal clearly was insolvent and the court finds that DVP had not waived its right to terminate the Second Supply Agreement based on Buffalo Coal's insolvency as of February 22, 2006.

Specifically regarding estoppel, the Trustee failed to demonstrate that a material fact was falsely represented or concealed. Contrary to the Trustee's argument, the record is devoid of evidence sufficient to establish that DVP lured Buffalo Coal into executing the Second Supply Agreement, all the while harboring a surreptitious intent to unilaterally or arbitrarily terminate the Agreement. In fact, while the Second Supply Agreement was a representation by DVP that it would continue to do business with Buffalo Coal despite its financial condition in October 2005, the facts and circumstances of Buffalo Coal's operations, as stated above, had significantly changed by February 22, 2006. DVP was not estopped from raising insolvency as a basis for terminating the Second Supply Agreement as of February 22, 2006.

Finally, the court does not find sufficient evidence of estoppel or waiver by conduct. Although the Trustee identifies instances in advance of February 22, 2006 that DVP could have terminated the Second Supply Agreement based on Buffalo Coal's insolvency, the court believes that DVP's failure to act on such earlier dates does not constitute a waiver or estoppel; rather, it constitutes the exercise of good faith in allowing Buffalo Coal time to deliver on its promises and turn-around its finances and operations.

-14-

## **III. CONCLUSION**

For the above stated reasons, the court will deny the relief sought by the Trustee in his adversary complaint against DVP. The court will enter a separate order pursuant to Fed. R. Bankr P. 7058.

-15-